[No. B178428. Second Dist., Div. Four. Mar. 29, 2006.]

TOBY HARRIS et al., Plaintiffs and Appellants, v.
INVESTOR'S BUSINESS DAILY, INC., et al., Defendants and
Respondents.

30

---

**COUNSEL**

Thierman Law Firm, Mark R. Thierman; Law Offices of Eric M. Epstein, Eric M. Epstein; Hoffman & Lazear, H. Tim Hoffman and Arthur Lazear for Plaintiffs and Appellants.

Law Office of Marjorie G. Fuller, Marjorie G. Fuller, Vicki Marolt Buchanan; Silver & Freedman, Belle C. Mason and Stephen M. Bernardo for Defendants and Respondents.

## OPINION

**EPSTEIN, P. J.**—In this wage-and-hour class action lawsuit, telemarketers who sold newspaper subscriptions alleged violations of federal and state labor laws. The principal issues on appeal are: (1) whether a federal Fair Labor Standards Act[1] (FLSA) claim may serve as the predicate act for a California Business and Professions Code section 17200 (section 17200) cause of action; (2) whether the employees qualified for the commission exemption from California overtime laws; and (3) whether the employer lawfully deducted points employees had earned from a sale if the customer later cancelled the subscription. Finding the FLSA does not preempt the section 17200 claim, we conclude the trial court improperly sustained the demurrer to that cause of action. We find triable issues of material fact exist as to the remaining claims and reverse the judgment as to those causes of action.

## FACTUAL AND PROCEDURAL SUMMARY

Appellants Toby Harris, Kevin O'Connor, Michael Sandercock, Alex Lane, and Michael Bey were employed as telemarketers to sell subscriptions to a financial newspaper, Investor's Business Daily, Inc. (IBD). IBD sold subscriptions through Direct Marketing Specialists, Inc. (DMSI).

Appellants were compensated on the basis of a point system which rewarded them for selling longer subscriptions, winning daily contests, and meeting weekly sales goals. Appellants were subject to a "chargeback"—a deduction from points earned on a sale if the customer cancelled the subscription within 16 weeks. The compensation plan provided that employees would be paid the greater of commissions earned on paid subscription sales or the prevailing minimum wage for hours worked.

In March 2002, appellants filed a class action lawsuit against IBD, DMSI, Data Analysis, Inc., and William O'Neil & Co., Incorporated alleging claims under the California Labor Code for overtime pay, unlawful commission deductions, and waiting penalties, and for unfair competition pursuant to section 17200. Harris sought individual damages for wrongful termination. The complaint requested certification of two classes—one for the chargebacks and one for overtime violations. A class was certified for the chargeback claim in September 2003.

Respondents moved for summary judgment or summary adjudication as to all causes of action except Harris's individual claim. Appellants filed a second amended complaint, adding a new claim under section 17200, alleging

---

[1] Title 29 United States Code section 207(a)(1).

violations of the FLSA. Respondents demurred and moved to strike the new claim. The trial court sustained the demurrer to the new section 17200 claim without leave to amend, dismissed without prejudice the seventh cause of action alleging violations of California's Private Attorneys General Act,[2] severed Harris's individual claim, and granted summary adjudication on all other causes of action.

Appellants filed a timely appeal.

## DISCUSSION

### I

Appellants argue that the trial court erred in sustaining respondents' demurrer on the unfair competition cause of action, which alleged violation of federal overtime laws. They assert that an FLSA violation may serve as the predicate act for a section 17200 claim. Respondents argue that the claim is preempted by the FLSA because traditional opt-out class actions are available under the California law, while, under FLSA, class members must opt in.

On appeal from an order sustaining a demurrer without leave to amend, we give the complaint a reasonable interpretation, and treat the demurrer as admitting all material facts properly pleaded. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171].)

■ The cause of action at issue is a claim for unpaid federal overtime pursuant to 29 United States Code section 207. This section requires potential class members to affirmatively join the action: "No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." (29 U.S.C. § 216(b).) The FLSA establishes a floor for wage-and-hour requirements, but expressly contemplates that other laws may increase those minimum requirements. A "savings clause" provides that nothing in the FLSA "shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum workweek lower than the maximum workweek established under this chapter." (29 U.S.C. § 218(a).)

■ Appellants' eighth cause of action was based on section 17200, which allows recovery for "any unlawful, unfair or fraudulent business act or practice. . . ." An action based on this state statute "borrows" violations of

---

[2] Labor Code sections 2698–2699.

other laws when committed pursuant to business activity. (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383 [6 Cal.Rptr.2d 487, 826 P.2d 730].)

At the time this case was filed, section 17200 permitted representative actions. The statute was amended in November 2004 by Proposition 64. It now requires that relief may be sought only by persons who have themselves suffered injury, and a representative claim requires class certification under the Code of Civil Procedure section 382. (Bus. & Prof. Code, § 17203.) The retroactivity of Proposition 64 is currently pending before the Supreme Court in *Branick v. Downey Savings & Loan Assn.* ■ (Cal.App.) review granted April 27, 2005, S132433. The issue was not before the trial court and was discussed only in a footnote in the argument before us. Assuming but not deciding that Proposition 64 does not affect the present controversy, we proceed to the merits.

■ The supremacy clause of the United States Constitution requires courts to find federal preemption of state law where it is clear that Congress, in exercising its constitutional power, intended to eclipse the historic police powers of the state. (U.S. Const., art. VI, cl. 2; *Gibbons v. Ogden* (1824) 22 U.S. 1, 9 [6 L.Ed. 23]; *Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 372 [147 L.Ed.2d 352, 120 S.Ct. 2288].) There are three generally recognized types of preemption. Express preemption occurs where Congress expressly defines the extent to which a federal provision preempts state law. (See *Crosby v. National Foreign Trade Council, supra,* at p. 372.) Courts also find preemption when federal regulation of an area is so broad and pervasive that it appears Congress intended federal law to occupy the field. (*United States v. Locke* (2000) 529 U.S. 89, 108 [146 L.Ed.2d 69, 120 S.Ct. 1135].) Finally, conflict preemption occurs: (1) where it is impossible for a private party to comply with both a state and federal requirement, or (2) the state law stands as an obstacle to the accomplishment of the congressional objectives. (*Freightliner Corp. v. Myrick* (1995) 514 U.S. 280, 287 [131 L.Ed.2d 385, 115 S.Ct. 1483].) To determine whether federal law preempts state law, we look to the express or implicit intent of Congress. (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 567 [59 Cal.Rptr.2d 186, 927 P.2d 296].)

■ Respondents assert that conflict preemption is applicable here, since it is impossible to comply with both the opt-in provision of FLSA and the opt-out requirement of section 17200. We disagree.[3] Congress amended the FLSA to prohibit any employee from pursuing an FLSA claim "unless he

---

[3] The court requested letter briefs on whether preemption is applicable to the named plaintiffs. Since we have decided that preemption does not apply, we need not specifically address that further issue.

gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." (29 U.S.C. § 216(b).) The legislative history clearly indicates that the purpose of the amendment was to protect employers from facing "financial ruin" and prevent employees from receiving "windfall payments, including liquidated damages." (29 U.S.C. § 251(a); see also *Hoffmann-La Roche Inc. v. Sperling* (1989) 493 U.S. 165, 173 [107 L.Ed.2d 480, 110 S.Ct. 482] [congressional intent behind FLSA opt-in procedure was to limit private plaintiffs due to an influx of litigation].) These concerns, however, are absent in a section 17200 action limited to restitution. We have found no federal opinion questioning this rationale. In fact, the weight of federal authority supports appellants' contention that the section 17200 claim is not preempted by FLSA. We may consider the opinions of federal courts when construing federal statutes (*Flynt v. California Gambling Control Com.* (2002) 104 Cal.App.4th 1125, 1132 [129 Cal.Rptr.2d 167], and even unpublished federal opinions have persuasive value in this court, as they are not subject to California Rules of Court, rule 977, which bars citation of unpublished California opinions. (*City of Hawthorne ex rel. Wohlner v. H&C Disposal Co.* (2003) 109 Cal.App.4th 1668, 1678 [1 Cal.Rptr.3d 312].)

Appellants rely on an apparently unreported recent case, *Bahramipour v. Citigroup Global Markets, Inc.* (N.D.Cal. Feb. 22, 2006, No. C 04-4440 CW) 2006 WL 449132, which is expressly on point. A former securities broker filed a claim against her employer under section 17200 based upon violations of the FLSA. She sought restitutionary damages for wage-and-hour violations. The court rejected the employer's argument that the opt-out class certification procedure sought by the plaintiff in her section 17200 claim was preempted by the FLSA opt-in requirements. It reasoned that the section 17200 opt-out procedure does not conflict with the congressional purpose in enacting the FLSA, as amended by the Portal-to-Portal Act, because legislative concerns about liquidated damages and large payments are obviated in a section 17200 suit limited to restitution. (*Bahramipour v. Citigroup Global Markets, Inc., supra,* 2006 WL 449132 at pp. *4–5.)

Appellants also rely on *Barnett v. Washington Mutual Bank* (N.D.Cal. Sept. 9, 2004, No. C 03-00753 CRB) 2004 WL 2011462, another unreported district court decision. In that case, bank personnel who sold home mortgage loans over the telephone claimed violations of section 17200 predicated on state and FLSA labor regulations. On the preemption issue, the court held that, to the extent it was based on violations of the FLSA, the claim was not preempted "in light of the [FLSA's] savings clause and in the absence of a clear indication from Congress to the contrary." (*Barnett v. Washington Mutual Bank, supra,* 2004 WL 2011462 at p. *6.) The court reasoned that the FLSA is not an exclusive remedy for claims "duplicated by or equivalent of rights" covered by the FLSA. (*Ibid.*) The court also noted that the claim could be characterized as a state wage claim and hence fall within the FLSA's savings clause.

*Stokes v. Saga Intern. Holidays, Ltd.* (D.Mass. 2003) 218 F.R.D. 6, dealt only with the constitutionality of section 17200. Employees alleged violations of the FLSA, California Labor Code provisions, and section 17200, the California unfair competition law. The defendants claimed that a representative action pursuant to section 17200 offends due process because it fails to provide notice to the unnamed plaintiffs. The court rejected this claim, holding that the court may resolve any due process concerns by implementing protections on a case-by-case basis. (*Stokes, supra,* at pp. 11–12.)

In *Kelley v. SBC* (N.D.Cal. 1998) 5 Wage & Hour Cas.2d (BNA) 16, the plaintiffs brought two causes of action for overtime violations—one under the FLSA and another under the Labor Code. They also alleged a violation of section 17200. The court dismissed the unfair competition cause of action because, at that time, section 17200 authorized only restitution or injunctive relief, not damages for unpaid wages. In granting the plaintiffs' request for class certification on the pendent state law claims (under the Labor Code), the court rejected the defendants' argument that Federal Rules of Civil Procedure, rule 23 is inapplicable to actions under the FLSA because that rule contains opt-out provisions while the FLSA specifies an opt-in provision. The court reasoned that because the two causes of action were similar, the classes would not "alter the substance of the litigation nor unduly complicate the process." (*Kelley, supra,* at p. 38.) The result was that two separate classes coexisted in one lawsuit, one asserting federal claims and one asserting state claims.

Similarly, in *Aguayo v. Oldenkamp* (E.D.Cal. Oct. 3, 2005, No. CV F 04-6279 ASI LJO) 2005 WL 2436477, the court allowed the certification of two classes, one for FLSA claims and one for unfair competition claims. The court rejected defendant's preemption argument, holding that section 17200 did not stand as an obstacle to accomplishment of congressional objectives. The court explained that section 17200 promotes the FLSA's purpose to protect workers from labor violations. *Tomlinson v. Indymac Bank, F.S.B.* (C.D.Cal. 2005) 359 F.Supp.2d 898, 900–902, presents similar facts and reasoning. There, the district court held that an FLSA claim under section 17200 was not barred by the opt-in procedural requirement because the section 17200 remedy was limited to restitution, and therefore did not frustrate the legislative purpose behind the opt-in requirement—to prevent financial ruin for employers and windfall payments to employees. The court found no legislative intent to forbid states from permitting claims for overtime wages by employees who have not opted into a representative class.

Federal courts are split as to whether to extend supplemental jurisdiction in the context of class action lawsuits involving a federal opt-in class and a state opt-out class. Appellants point to cases extending jurisdiction over an entire state law class, regardless of whether each individual member has opted into

the FLSA class. (See, e.g., *Ansoumana v. Gristede's Operating Corp.* (S.D.N.Y. 2001) 201 F.R.D. 81 [court exercised supplemental jurisdiction over federal FLSA claims and state minimum wage claims]; *Ramirez v. NutraSweet Co.* (N.D.Ill. Sept. 11, 1996, No. 95 C 130) 1996 WL 529413 [court certified class on breach of contract claim where other claims were under FLSA and state minimum wage act]; *Krueger v. New York Telephone Co.* (S.D.N.Y. 1995) 163 F.R.D. 433, rejected by *Bayles v. American Medical Response of Colorado* (D.Colo 1996) 950 F.Supp. 1053 [court authorized collective action for FLSA claims and certified second class for other state and federal claims]; *Leyva v. Buley* (E.D.Wash. 1989) 125 F.R.D. 512 [same].)

Appellants cite additional cases in their reply brief. In *Bureerong v. Uvawas* (C.D.Cal. 1996) 922 F.Supp. 1450, 1477–1478, the court held that the FLSA does not preempt a claim for unfair business practices under section 17200, where the claim included violations of federal and state labor laws. The court referenced the savings clause in support of its decision. Appellants also rely on several employment contract cases: *Avery v. City of Talladega, Ala.* (11th Cir. 1994) 24 F.3d 1337, 1348 [state law contract claim not preempted by FLSA because the contract incorporated FLSA and therefore provided no greater rights]; *Hammond v. Lowe's Home Centers, Inc.* (D.Kan. 2004) 316 F.Supp.2d 975 [breach of contract claim not preempted by FLSA where employer agreed to provide more protection than FLSA requires, as the statute of limitations for a contract claim is longer than for an FLSA claim].

■ In light of the federal authority discussed *ante*, we hold that a single cause of action alleging violations of the FLSA under section 17200 is not preempted by the FLSA opt-in requirement. Therefore, we shall reverse the order dismissing this cause of action.

## II

Appellants argue the trial court erred in granting summary adjudication on the overtime cause of action because they raised a material issue of fact as to whether they were subject to the commission exemption from California overtime protections.

We review an appeal from a grant of summary adjudication de novo. (*Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663 [38 Cal.Rptr.3d 36].) The moving party bears the burden of showing that there is no triable issue of material fact and that he or she is entitled to judgment as a matter of law. (*Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463 [38 Cal.Rptr.3d 653].) We view the evidence and reasonable inferences from the evidence in the light most favorable to the opposing party. (*Ibid.*)

██ The California law mandates that all employees who work in excess of eight hours in one workday or in excess of 40 hours in one workweek receive overtime pay. (Lab. Code, § 510, subd. (a).) This provision does not apply to any employee *"whose earnings exceed one and one-half . . . the minimum wage if more than half of that employee's compensation represents commissions."* (Cal. Code Regs, tit. 8, § 11040, subd. 3(D), italics added.) A commission is compensation paid for services rendered in the sale of property and services, and "based proportionately upon the amount or value thereof." (Lab. Code, § 204.1.) In *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 803–804 [85 Cal.Rptr.2d 844, 978 P.2d 2] (*Ramirez*), the Supreme Court defined two essential requirements for finding that a compensation scheme involves commissions: (1) that the employees are involved in selling a product or service, and (2) that the amount of compensation is "a percent of the price of the product or service." "[T]he assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption." (*Id.* at pp. 794–795.)

There is no dispute that appellants sold a product—subscriptions to IBD. Whether all or part of their compensation may be characterized as a commission depends on whether they were paid on the basis of a percentage of the price of subscriptions sold. The employees were paid on a point system based on the number of points earned. Employees received a certain number of points for each type of subscription sold. For example, an employee received 0.25 points for a 13-week subscription. Employees also received points for winning sales contests, called "spiffs," and were eligible for fixed monetary bonuses if they sold a specified number of points at certain levels. As employees earned more points, the value of the points increased. Employees were paid $15.80 per point for the first 9.99 points earned, $22.30 for the next 10 to 16.99 points, and so on. The point values were not tied to the price of the subscription sold.

Appellants presented the declaration of an expert, Dean S. Barron, to demonstrate that the point system was not a commission compensation scheme. Based on a random sample of 280 out of approximately 18,000 time cards, Barron concluded that the employees were paid "on [a] combination of sales points, incentive points ('SPIFF'), adjustment points, an apparent qualitative point adjustment ('(Less) Points Over 25%'), 40/80 commission, daily graphs, adjustment amount, bonus, charge-backs, carried over deductions, and other factors." He also stated that "[a] true commission basis would characteristically feature a commission amount that is directly related to the dollar amount of the product or services sold."

Objections were made to the declaration in the trial court based on Barron's qualifications and methodology. None is raised on appeal, and we consider Barron's declaration and assume he presented a sufficient foundation for his opinions. (*Parkview Villas Assn., Inc. v. State Farm Fire & Casualty*

*Co.* (2005) 133 Cal.App.4th 1197, 1217 [35 Cal.Rptr.3d 411]; and see Code Civ. Proc., § 437c, subds. (b) & (c); *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1186, fn. 1 [91 Cal.Rptr.2d 35, 989 P.2d 121], disapproved on other grounds by *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

Respondents challenge whether compensation must be a percent of the product price to qualify as a commission payment. They argue that commission compensation may be based on "value," a term that goes beyond price to include "worth, merit and importance." As has been discussed, our Supreme Court has interpreted the statute to mean that the amount of compensation "must be a percent of the price of the product or service." (*Ramirez, supra,* 20 Cal.4th at p. 804.) We decline respondents' invitation to expand the meaning of the term. In any event, "value" is too vague a standard. The term encompasses a broad range of meanings. Respondents point to its dictionary definition of "worth, merit and importance." A term this broad is not useful in establishing a universal standard governing commission exemptions.

Respondents also argue that whether the points constitute commission payments is a question of law because the facts describing the point system are undisputed. They contend that the only contested issue is the interpretation of Labor Code section 204.1. We agree with respondents that if the facts are undisputed, the conclusion is a question of law. Respondents presented a chart showing that points are based on the type of subscriptions sold. There was no showing that the points are tied to a particular price. A six-month subscription may result in more points than a one-year subscription, but there is no evidence that all subscriptions for the same period are sold at the same price. As we have seen, Barron's declaration demonstrated that points received from bonuses, subscriptions, and sales contests were not based on the price of the subscriptions. Further, a DMSI sales manager testified that he did not know of any IBD commission schedule that awarded points based on the price of the subscription.

Applying de novo review, we conclude that the payments received by the employees did not constitute commissions. Our adjudication is, of course, determinative that, based on the materials before the court on summary judgment, the commission exemption does not apply in this case. (See *Bergman v. Drum* (2005) 129 Cal.App.4th 11, 18–19 [28 Cal.Rptr.3d 112]; see also *Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 309–313 [126 Cal.Rptr.2d 516]; cf. *Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 108 [115 Cal.Rptr.2d 285].)

Even if the point system as described in the summary judgment papers did constitute commissions, respondents would still fail on summary judgment because they did not demonstrate, as a matter of law, that more than half of

the employees' compensation was from commissions. (*Ramirez, supra,* 20 Cal.4th at p. 794.) Respondents concede that compensation for weekly bonuses and sales contests are not commissions, but argue that it was impossible for an employee to earn more than half of the weekly salary from those incentive systems. The reason, respondents argue, is that the bonuses and spiffs were calculated as a percentage of the points earned from subscriptions and were thus necessarily lower than the dollar amounts earned from points. Appellants demonstrated a triable issue of fact on the point by presenting evidence that none of the compensation constituted commission.

Nor were respondents able to demonstrate, as a matter of law, that the employees' total compensation was more than one and one-half times the minimum wage. (Cal. Code Regs, tit. 8, § 11040, subd. 3(D).) Respondents claim that they "presented substantial evidence the telemarketers admitted they always received minimum payments." The record does not support this claim.

Respondents first cite to the declarations of their own sales manager and a former telemarketing supervisor. Both stated that "Plaintiffs who worked more than 40 hours in a week or more than 8 hours in a day, regularly earned commissions in excess of one-and-one-half times the minimum wage." They also cite to depositions of three of the named plaintiffs. The first citation refers to O'Connor's deposition, where he was asked, "And you're paid on a weekly basis the greater that dollar amount or the minimum wage; is that correct?" He answered, "Yes." In his deposition, Bey stated that he was paid "[e]ither the greater of my points or my hourly wage." Sandercock stated that the amount of commission he earned always exceeded the minimum wage, and that he earned approximately $6,260 per month in the year 2000–2001. Respondents' last citation refers to a page attached to Sandercock's deposition entitled "DMSI INCOME FOR 6 YEARS EMPLOYMENT," which indicates that he earned approximately $20,000 from May to December in 1995, $30,000 in 1996, $33,000 in 1997, $43,000 in 1998, $35,000 in 1999, $44,000 in 2000, and $12,000 from January through May, 2001.

Only Sandercock discussed his exact earnings. He did not admit or even mention that his earnings comprised more than 150 percent of the minimum wage. He admitted only that he earned more than the minimum wage—not how much more. Respondents presented no employee time card evidence to determine whether employees' compensation met the threshold for the commission exemption. Nor did they present other evidence sufficient to demonstrate that appellants qualified for the exemption. Appellants raised a triable issue of fact on this issue with Barron's declaration, which stated that "several Plaintiffs[] did not receive the minimum wage for all hour[s] worked."

Respondents failed to show that appellants received more than half of their compensation through commissions and that they received more than one and

one-half times the minimum wage. We conclude that the grant of summary adjudication on the first cause of action must be reversed.

## III

Appellants argue that the trial court erred in granting summary adjudication on the second and third causes of action alleging that IBD's chargeback policy was unlawful and unconscionable. Under that policy, employees were "charged back" the points earned from a sale if the customer cancelled within 16 weeks. The chargeback included any bonuses earned by reason of the employee being at a high earning level. Appellants assert the policy unjustly enriched IBD, since IBD retained a portion of the subscription price, while the employees received nothing.

Respondents argue the chargebacks were a lawful recovery of an advance. They reason that the commission was not earned until the subscriber had been a customer for 16 weeks, and money paid to the employee in the meantime is merely an advance on commissions that may be earned. Respondents also argue that appellants were aware of and agreed to the policy.

Respondents' statement of general personnel policy, dated January 1999, describes the policy: "Any subscription which is canceled within 16 calendar weeks from the start, or restart, date of the subscription will be charged back to the week sold. The unit amount earned, as well as the associated dollar value of the unit amount earned, will be deducted in full. . . . If the department is unable to prevent cancellation, the unit value will be charged back in full." Appellants point out that this policy was changed in November 2001, after appellants' complaint was filed in this case. The revised policy states that commissions will be "*advanced* to Associates based on the date in which payment is authorized and posted to the account. If a customer cancels a subscription within the first 16 weeks no commission is earned. The unit amount *advanced* as well as associated dollar value of the unit amount *advanced* will be deducted in full from the Associates weekly paycheck." (Italics added.) Appellants contend that the 1999 policy indicates that the commission was earned at the time of sale. "If the commission is earned at the point of sale," they argue, "then the money paid for commissions is wages, not an advance."

Labor Code section 221 prevents an employer from taking back any wages from an employee after they are earned. The statute provides: "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Wages are defined broadly to include "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." (Lab. Code, § 200.) The statute illustrates California's strong public policy favoring

the protection of employees' wages. (*Ralphs Grocery Co. v. Superior Court* (2003) 112 Cal.App.4th 1090, 1096–1097 [5 Cal.Rptr.3d 687].)

Respondents cite *Steinhebel v. Los Angeles Times Communications, LLC* (2005) 126 Cal.App.4th 696 [24 Cal.Rptr.3d 351], to support their position. *Steinhebel* is distinguishable. There, the court upheld a chargeback system based on facts similar to those in this case, but with a critical difference— the employment agreement clearly identified the commission as an advance: "The Times will pay you two weeks in advance for the order. Beginning on the second pay period after your start date, you will receive an *advance* against your commissions." (*Id.* at p. 702, italics added.) The court reasoned that, because a condition to the employee's right to the commission had yet to occur, an advance was not a wage within the meaning of section 221. (126 Cal.App.4th at p. 705.)

Respondents also point to *Hudgins v. Neiman Marcus Group, Inc.* (1995) 34 Cal.App.4th 1109 [41 Cal.Rptr.2d 46], which held that Neiman Marcus's commission program violated section 221 because it unlawfully deducted "a pro rata share of commissions previously paid for 'unidentified returns' from the wages of all sales associates in the section of the store where the merchandise is returned." (34 Cal.App.4th at p. 1117.) Respondents note that the court "found nothing wrong with chargebacks for rescinded sales attributable to a specific sales associate." That case is not directly on point, as it analyzes the legality of commission deductions attributable to "unidentified returns" in a situation where employees were penalized for the misconduct of other employees.

Unlike the employees in *Steinhebel* and *Hudgins,* appellants did not expressly agree to the chargeback policy in writing. Even if they knew about the policy, IBD's materials suggested that the points were earned at the time of the sale, not at some designated point in the future. IBD's position differs from that of Neiman Marcus, in that IBD retained the payment received for the portion of time during which the customer received the newspaper, while Neiman Marcus retained nothing after the merchandise was returned.

The trial court erred in granting summary adjudication on the unlawful wage deduction claim. Respondents failed to demonstrate that they were entitled to judgment as a matter of law. A triable issue of fact exists as to whether the chargeback plan in effect during appellants' employment violates Labor Code section 221. The cause of action for unjust enrichment and unconscionability is dependent upon the outcome of the unlawful deduction claim at trial; we decline to reach it here.

## DISPOSITION

The judgment is reversed. We reverse the order following the sustaining of the demurrer to the section 17200 cause of action. We reverse the grant of summary adjudication on the first, second, and third causes of action, alleging violations of California labor laws. The case is remanded to the superior court for proceedings consistent with this opinion. Appellants are to recover their costs on appeal.

Curry, J., and Hastings, J.,* concurred.

A petition for a rehearing was denied April 24, 2006, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied June 28, 2006, S143242.

---

*Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.