[Nos. D057955, D058958. Fourth Dist., Div. One. Aug. 29, 2012.]

TYRONE MULDROW et al., Plaintiffs and Appellants, v.
SURREX SOLUTIONS CORPORATION, Defendant and Respondent.

COUNSEL

Hogue & Belong, Jeffrey Lee Hogue, Tyler J. Belong, Tony R. Skogen, Jr.; Law Offices of John S. Addams, Niddrie, Fish & Addams and John S. Addams for Plaintiffs and Appellants.

Gibbs & Fuerst, Michael T. Gibbs and Kevin L. Borgen for Defendant and Respondent.

OPINION

AARON, J.—

## I.

## INTRODUCTION

In this appeal from a judgment after a bench trial, we consider two issues. First, we address whether the trial court erred in determining that an

employer was not required to pay overtime wages (Lab. Code, § 510)[1] to a class of its current and former employees because they were subject to the commissioned employees exemption (Cal. Code Regs., tit. 8, § 11070, subd. 3(D)). Pursuant to this exemption, employers are not required to pay overtime wages to employees "whose earnings exceed one and one-half (1 1/2) times the minimum wage if more than half of that employee's compensation represents commissions." (*Ibid.*) Second, we address whether the trial court erred in denying the class members' claim for missed meal periods on the ground that the employer was required only to provide such periods, and was not required to ensure that employees actually took the meal breaks.

In our initial opinion in this matter, we concluded that the trial court properly determined that the employees were subject to the commissioned employees exemption. We also concluded that the trial court had not erred in denying the meal period claim. The Supreme Court granted the class's petition for review and deferred further action in the matter pending its consideration of a related issue in *Brinker Restaurant Corp. v. Superior Court* (Cal.App.). The Supreme Court subsequently transferred the case back to this court with directions to vacate our earlier decision and to reconsider the case in light of *Brinker Restaurant Corp. v. Superior Court, supra,* 53 Cal.4th at p. 1037 (*Brinker*). Upon transfer, we issued an order vacating our prior decision and soliciting briefing on the effect of *Brinker*, if any, on the issues in this case.

It is undisputed that *Brinker* does not affect our prior conclusion that the trial court properly determined that the class employees were subject to the commissioned employees exemption. With respect to the class members' meal break claim, in *Brinker* the Supreme Court held that while an employer has a duty to provide meal periods to its employees, it "is not obligated to police meal breaks and ensure no work thereafter is performed." (*Brinker, supra,* 53 Cal.4th at p. 1040.) Accordingly, we again reject the class members' claim that the trial court erred "in ruling that [the employer] was not obligated to ensure that meal period[s] were taken," and affirm the judgment and a postjudgment order awarding costs to the employer.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

Tyrone Muldrow filed this action against Surrex Solutions Corporation (Surrex) on behalf of himself and a class of current and former Surrex

---

[1] Unless otherwise specified, all subsequent statutory references are to the Labor Code.

employees. In his complaint, Muldrow brought causes of action including failure to pay overtime (§ 510) and failure to provide meal periods (§ 512), among other claims. The trial court certified a class of current and former Surrex "senior consulting services managers," who formerly worked (or were currently working) as employment recruiters for Surrex, since January 31, 2004.

At a bench trial of the class members' claims, Surrex asserted that it was not required to pay overtime to the class members because they were subject to the commissioned employees exemption (Cal. Code Regs., tit. 8, § 11070, subd. 3(D)) and the administrative employees exemption (*id.*, subd. 1(A)(2)). Surrex also contended that it had provided meal periods to the class members, as required.

The trial court determined that the class members were subject to the commissioned employees exemption. The trial court further concluded that Surrex had provided meal periods for the class members, and that the law did not obligate Surrex to ensure that the employees utilized the meal periods. Because these determinations disposed of the action, the court did not proceed to determine whether the class members were subject to the administrative employees exemption. The court entered judgment and a postjudgment award of costs in favor of Surrex.

Appellants filed an appeal from the judgment in which they claim that the trial court erred in determining that the commissioned employees exemption applied to them and that they were therefore not entitled to overtime. In addition, appellants claim that the trial court erred in denying their claim for missed meal periods.[2] Appellants also filed an appeal from a postjudgment order awarding costs to Surrex. Pursuant to the parties' stipulation, this court consolidated the appeal from the judgment with the appeal from the postjudgment cost award.[3]

---

[2] Appellants contend that this court should determine that the administrative exemption did not apply to them, and that the class suffered certain monetary damages for uncompensated overtime. In addition, appellants request that this court order a limited retrial on damages for missed meal periods. We need not consider these additional contentions in light of our affirmance of the judgment in favor of Surrex.

[3] Apart from their contentions as to why the judgment should be reversed, appellants do not raise any claims with respect to the postjudgment cost award. Accordingly, in light of our affirmance of the judgment, we also affirm the postjudgment cost award.

III.

## DISCUSSION

A. *The trial court did not err in determining that appellants were not entitled to overtime pay because they were subject to the commissioned employees exemption*

Appellants claim that the trial court erred in determining that Surrex was not required to pay them overtime (§ 510) because they were subject to the commissioned employees exemption (Cal. Code Regs., tit. 8, § 11070, subd. 3(D)).

### 1. *Standard of review*

Appellants' contention raises a mixed question of law and fact. (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 794 [85 Cal.Rptr.2d 844, 978 P.2d 2] (*Ramirez*) ["The question whether Ramirez was an outside salesperson within the meaning of applicable statutes and regulations is, like other questions involving the application of legal categories, a mixed question of law and fact."].) Mixed questions of law and fact are reviewed de novo, where the claim to be reviewed is "predominantly one of law." (*In re Marriage of Sonne* (2010) 48 Cal.4th 118, 124 [105 Cal.Rptr.3d 414, 225 P.3d 546].)

In this appeal, appellants contend that the trial court erred in determining that they were subject to the commissioned employees exemption, in light of undisputed facts pertaining to both their employment duties and Surrex's compensation system. We apply the de novo standard of review to this claim, since the claim raises a question of law. (See *Ramirez, supra,* 20 Cal.4th at p. 794 [applying de novo standard of review because, "[i]n the present case, although there was some controversy as to the facts—i.e., as to what Ramirez did as an employee for Yosemite—the predominant controversy is the precise meaning of the term 'outside salesperson,' a question of law."].)

### 2. *Governing law*

#### a. *Relevant statutory and regulatory provisions*

█ Section 510, subdivision (a) specifies that eight hours of labor constitute a day's work, and that any work in excess of eight hours in one day, 40 hours in one workweek, and the first eight hours worked on the seventh day of work in any workweek "shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee."

■ California's Industrial Welfare Commission (IWC) wage order No. 7-2001 exempts from this statutory overtime compensation requirement "any employee whose earnings exceed one and one-half (1 1/2) times the minimum wage if more than half of that employee's compensation represents commissions." (Cal. Code Regs., tit. 8, § 11070, subd. 3(D).)[4]

### b. *Relevant case law*

In *Keyes Motors, Inc. v. Division of Labor Standards Enforcement* (1987) 197 Cal.App.3d 557 [242 Cal.Rptr. 873] (*Keyes Motors*), the Division of Labor Standards Enforcement (DLSE) determined that an employer that sold and serviced automobiles was required to pay overtime wages to its mechanics. The employer sought a judicial declaration that it was not required to pay overtime wages to its mechanics because the mechanics' compensation, which was based on a percentage of the hourly rate charged to customers for repairs, constituted "commission wages." (*Id.* at p. 560.) The trial court granted the requested relief. (*Id.* at p. 561.)

On appeal, the *Keyes Motors* court began its analysis of the relevant statutory and regulatory provisions by stating that the "DLSE is the body charged with administration and enforcement of IWC orders . . . ," and that the "DLSE's primary responsibility is to interpret the intent of the IWC." (*Keyes Motors, supra*, 197 Cal.App.3d at pp. 561–562.) The *Keyes Motors* court then noted that the "DLSE has consistently read [the commissioned employees exemption] to exempt from overtime only employees in *sales* positions." (*Keyes Motors, supra*, at p. 562, italics added.) The *Keyes Motors* court further observed that the DLSE cited the following portion of section 204.1[5] in support of its position: " 'Commission wages are compensation paid to any person *for services rendered in the sale* of such employer's property or services and based proportionately upon the amount or value thereof.' " (*Keyes Motors, supra*, at p. 562, quoting § 204.1.)

In adopting the definition of commission wages in section 204.1 for purposes of determining the applicability of the commissioned employees

---

[4] In this case, it is undisputed that the class members' earnings exceeded one and one-half times the minimum wage.

[5] Section 204.1 provides:

"Commission wages paid to any person employed by an employer licensed as a vehicle dealer by the Department of Motor Vehicles are due and payable once during each calendar month on a day designated in advance by the employer as the regular payday. Commission wages are compensation paid to any person for services rendered in the sale of such employer's property or services and based proportionately upon the amount or value thereof.

"The provisions of this section shall not apply if there exists a collective bargaining agreement between the employer and his employees which provides for the date on which wages shall be paid."

exemption, the *Keyes Motors* court stated, "We conclude Labor Code section 204.1 sets up two requirements, both of which must be met before a compensation scheme is deemed to constitute 'commission wages.' First, the employees must be involved principally in *selling* a product or service, not making the product or rendering the service. Second, the amount of their compensation must be a percent of the price of the product or service." (*Keyes Motors, supra*, 197 Cal.App.3d at p. 563.)

In applying the first of these requirements, the *Keyes Motors* court stated, "Common sense militates against conceiving of auto mechanics as 'commission salesmen' any more than plumbers or electricians simply because their employers sell automobiles." (*Keyes Motors, supra*, 197 Cal.App.3d at p. 564.) The court also commented, " '[t]he DLSE's interpretation is entitled to great weight . . . .' [Citation.]" (*Ibid.*) Ultimately, the *Keyes Motors* court held that the trial court had erred in determining that the mechanics were subject to the commissioned employees exemption. (*Ibid.*)

In *Ramirez*, our Supreme Court considered the meaning of "outside salesperson" as used in section 1171 in determining whether an employee who engaged in sales and who performed delivery functions for a bottled water company was exempt from the state's overtime laws. (*Ramirez, supra*, 20 Cal.4th at p. 794.) After concluding that the trial court and the Court of Appeal had erred in their interpretation of section 1171, the court remanded the case to the trial court to make a factual determination as to whether the employee was in fact an "outside salesperson." (*Ramirez, supra*, at pp. 801, 803.)

As relevant to this case, the *Ramirez* court observed that the trial court had also concluded that the employee was subject to the commissioned employees exemption. (*Ramirez, supra*, 20 Cal.4th at p. 794.)[6] After noting that remand would not be necessary if the trial court were correct on this ground, the *Ramirez* court stated the following with respect to the commissioned employees exemption:

■ "The IWC wage order does not define the term 'commission,' but its meaning is set forth in Labor Code section 204.1 as follows: 'Commission wages are compensation paid to any person for services rendered in the sale of such employer's property or services and based proportionately upon the amount or value thereof.' Although section 204.1 applies specifically to employees of vehicle dealers, both parties contend, and we agree, that the statute's definition of 'commission' is more generally applicable. In interpreting this language, the Court of Appeal in [*Keyes Motors, supra*, 197

---

[6] The Court of Appeal in *Ramirez* had not reached the issue of the potential applicability of the commissioned employees exemption. (*Ramirez, supra*, 20 Cal.4th at p. 794.)

Cal.App.3d at page 563] stated: 'We conclude Labor Code section 204.1 sets up two requirements, both of which must be met before a compensation scheme is deemed to constitute "commission wages." First, the employees must be involved principally in selling a product or service, not making the product or rendering the service. Second, the amount of their compensation must be a percent of the price of the product or service.' (Italics omitted.)

"Ramirez was compensated at a flat rate of $1,200–$1,400 per month, plus a percentage of the price of the bottles of water and related products sold when sales exceeded the flat rate. The parties dispute whether or not the $1,200–$1,400 sum represented a 'draw' against future bottle sales, or was more in the nature of a salary. But regardless of which it was, and regardless of whether Ramirez's compensation could be characterized as 'a percentage of the price of the product or service,' it is not at all clear that the first condition set forth by the *Keyes* [*Motors*] court was met. As discussed above, it remains to be clarified on remand whether Ramirez was 'involved principally in selling the product or service.' Because our determination of whether Ramirez was a commissioned employee depends partly on matters to be decided by the trial court on remand, we believe this question is also best resolved on remand." (*Ramirez, supra,* 20 Cal.4th at pp. 803–804.)

In *Harris v. Investor's Business Daily, Inc.* (2006) 138 Cal.App.4th 28 [41 Cal.Rptr.3d 108] (*Harris*), the Court of Appeal considered whether the commissioned employees exemption applied to a group of telemarketing employees who sold magazine subscriptions. In considering the first prong of the *Keyes Motors* test for determining the applicability of the exemption, the *Harris* court noted that it was undisputed that the telemarketers sold a product. (*Harris, supra,* at p. 37.) Thus, according to the *Harris* court, in determining whether the employees were exempt, the only question was "whether they were paid on the basis of a percentage of the price of subscriptions sold." (*Ibid.*) The employees in *Harris* were paid based on a point system in which they earned points related to the number of subscriptions sold.[7] In considering whether such a compensation system constituted commissions pursuant to the relevant regulation (Cal. Code Regs., tit. 8, § 11040, subd. 3(D)), the *Harris* court noted that "[t]here was no showing that the points are tied to a particular price," and that the employees

---

[7] The *Harris* court described the compensation system as follows: "The employees were paid on a point system based on the number of points earned. Employees received a certain number of points for each type of subscription sold. For example, an employee received 0.25 points for a 13-week subscription. Employees also received points for winning sales contests, called 'spiffs,' and were eligible for fixed monetary bonuses if they sold a specified number of points at certain levels. As employees earned more points, the value of the points increased. Employees were paid $15.80 per point for the first 9.99 points earned, $22.30 for the next 10 to 16.99 points, and so on. The point values were not tied to the price of the subscription sold." (*Harris, supra,* 138 Cal.App.4th at p. 37.)

demonstrated that "points received from bonuses, subscriptions, and sales contests were not based on the price of the subscriptions." (*Harris, supra,* at p. 38.) The *Harris* court held that "the payments received by the employees did not constitute commissions." (*Ibid.*)

Finally, in *Areso v. CarMax, Inc.* (2011) 195 Cal.App.4th 996 [124 Cal.Rptr.3d 785] (*Areso*), the Court of Appeal considered whether a class of car salespersons who were paid a uniform amount for each vehicle sold (approximately $150) were subject to the commissioned employees exemption. (*Id.* at p. 1007.) After noting that section 204.1 permitted commissions to be based on "amount or value," the *Areso* court stated: "Section 204.1 on its face allows wages based on the number of items sold to be considered commission wages. None of the cases interpreting section 204.1 has involved a compensation system which, like CarMax's, compensates salespeople with a uniform payment for each item or service sold, and as a result no case has construed the word 'amount' in the statute. This is an issue of first impression, and new facts require new law." (*Areso, supra,* at p. 1007, fn. omitted.)

The *Areso* court distinguished *Keyes Motors* and its progeny, stating, "The *Keyes Motor*['s] definition of 'commission' . . . does not control our case, as it does not exclude Areso's compensation from the ambit of section 204.1's definition of commission wages as 'based proportionately upon the amount *or* value' . . . ." (*Areso, supra,* 195 Cal.App.4th at p. 1006, italics added.) Accordingly, the *Areso* court held, "CarMax's uniform payment for each vehicle sold constitutes commission compensation under section 204.1." (*Id.* at p. 1009.)

### 3. *The class members' compensation constituted commissions*

Appellants claim that they were not subject to the commissioned employees exemption because they were not primarily engaged in sales, their commissions were not based on price, and Surrex's compensation system was not a bona fide commission system. We consider each argument in turn.

### a. *Appellants were engaged principally in selling a service*

Applying *Keyes Motors* and its progeny, we first consider whether appellants were employed "principally in *selling* a product or service." (*Keyes Motors, supra,* 197 Cal.App.3d at p. 563.)[8]

---

[8] In light of our conclusion below that the class members were principally involved in selling a service, we need not consider Surrex's contention that "[s]elling . . . is not a requirement" of the commissioned employees exemption.

### i. *Factual background*

Appellants' primary job duty was to recruit "candidates" for employer "clients." Surrex's clients would place "job orders" with Surrex and appellants would search for potential candidates to fill the job orders. Appellants would use various resources to find candidates, including an internal database that Surrex maintained and various "on-line job boards." Appellants would then attempt to convince both the candidate and the client that the placement of the candidate with the client was a proper fit. Michael Ellis, an executive vice-president for Surrex, described this part of the process as follows: "We have to convince the candidate that they're the right person, that this position is the right place for them. We have to convince them on dollars. We have to convince the client that this is the right person for them. We prep both sides. When they get together on the interview, that's where hopefully the magic happens. [¶] Then again, after they've met, we need to debrief both the client and the candidate to make sure to pull it together. Then we have to make sure to nail down the sides of the tent that have to do with rate, the client's rate, the candidate's rate, and then make sure it all comes together. It's a very difficult sale."

Surrex obtained revenue from a client only in the event of a successful placement. As Ellis testified, "The only money Surrex gets is when a client hires on the people that we find for them, and we bring them on as either an employee or a subcontractor to Surrex."

Appellants' employment agreements state that their duties and responsibilities include, "[a]ccount development, *sales*, account management, and recruiting." (Italics added.) Surrex's employees and executives testified that appellants were engaged in selling. For example, when asked to describe the traits of a successful consulting service manager, Ellis testified that the company looked for "highly motivated salespersons," stating, "It's all sales." Ellis also testified, "[I]f someone were to come to me and interview for a job at Surrex and tell me that they did not believe that recruitment is sales, . . . I would ask them to leave. They would not be hired." Robert Bishop, a senior consulting service manager at Surrex, testified "when I'm acting in a recruiting capacity, I do sales; recruiting individuals, convincing them to work for our company."[9] Surrex also presented evidence of sales-related training documents that it used, including a document entitled, "Major Differences Between Successful Sales People and Underachievers."

### ii. *Application*

The evidence discussed above demonstrates that appellants' job, reduced to its essence, was to offer a candidate employee's services to a client in

---

[9] Bishop was not a member of the class, and testified on behalf of Surrex at trial.

exchange for a payment of money from the client to Surrex. Offering a candidate's employment services in exchange for money meets the ordinary definition of the word "sell," which is "to give up (property)[10] . . . for something of value (as money)." (Merriam-Webster's Collegiate Dict. (10th ed. 1998) p. 1062, col. 2.) Further, Surrex presented evidence and testimony that appellants engaged in what is commonly thought of as sales-related activity—that is, they attempted "to persuade or influence [clients] to a course of action or to the acceptance of something." (*Ibid.* [defining "sell"].) Finally, it is undisputed that Surrex did not obtain any revenue unless and until an employer client selected a candidate proffered by a consulting services member. Thus, it was only upon the successful placement of a candidate that Surrex recorded a sale, and that a Surrex client became a *paying* client. Because only the successful placing of a candidate with an *existing* client resulted in actual revenue for Surrex, we reject appellants' argument that only the time that appellants spent "finding *more clients* to promote recruits to" may be "characterized as sales." (Italics added.)

We also reject appellants' contention that time spent "searching on the computer, searching for candidates on the website, cold calling, interviewing candidates, inputting data, and submitting resumes," may not be considered sales-related activities. We agree with the trial court's reasons for rejecting this argument: "[P]laintiffs point to the number of activities the employees are engaged in prior to the actual point in time that the sale is made. This argument perceives the word sales in a vacuum contrary to the job description of any salesman. The whole point of these activities, including online search for candidates, resume reviews, unsolicited (cold) calls, etc., are the essential prerequisites necessary to accomplishing the sale."

In light of the evidence of appellants' sales-related activities discussed above, we conclude that appellants were employed "principally in *selling* a product or service." (*Keyes Motors, supra*, 197 Cal.App.3d at p. 563.)[11]

### b. *Appellants' commissions were sufficiently related to price*

We next consider whether Surrex's commissions were sufficiently related to the price of services sold to constitute commissions for purposes of the commissioned employees exemption.

---

[10] Although this definition refers to "property," *Keyes Motors* makes clear that an employee may earn a commission while selling a "product or service." (*Keyes Motors, supra,* 197 Cal.App.3d at p. 563, italics added.)

[11] In the trial court, appellants acknowledged that certain tasks that they performed related to the placement of candidates constituted selling by stating that when they "actually went off-site to client meetings and candidate meetings those duties may constitute 'selling.' "

i. *Factual background*

Surrex generally placed candidates with clients in one of two ways. Some candidates were hired directly by employer clients. For these so-called "direct hire" placements, appellants received a commission equal to a percentage of the placement fee that Surrex received from the client. Appellants concede that such payments constitute commissions for purposes of the commissioned employees exemption.

Surrex placed other candidates by hiring them as consultants. The candidate-turned-consultant would then perform work for the client, and Surrex would in turn bill the client at an hourly rate for the consultant's services. As Glenn Crawford, an executive vice-president for Surrex, testified, "[The client] essentially leases [the candidate] from [Surrex] on an hourly basis." Appellants received a percentage of the "adjusted gross profit," that Surrex earned from the clients as payment for their placement of these candidate/consultants. Adjusted gross profit was defined generally as the rate at which clients were billed for a consultant, less the costs to Surrex of employing the consultant. Costs included the consultant's pay rate, benefits and expenses, as well as an overhead adjustment factor.

The precise formula for consultant commissions is specified in appellants' employment agreements. That formula states in relevant part: "The commission in the consulting business is earned at a starting rate of 32% of adjusted gross profit . . . . The adjusted gross profit is calculated as follows: AGP = bill rate (pay rate + burdened overhead + benefits + expenses). In most periods, billable consultants' expenses are zero. In most cases benefits are zero for W-4 hourly consultants. For W-4 salaried employees, benefits include all associated costs, including vacations, sick leave and bench time. Burdened overhead is 0.14 X pay rate."

ii. *Application*

Appellants contend that money they were paid pursuant to Surrex's consultant commission system does not qualify as commissions for purposes of the commissioned employees exemption. Specifically, appellants maintain that the formula is "too complex," since it is based on several cost-related factors in addition to price. Appellants argue: "[T]he commission formula for consulting placements was far too complex to fall within the exemption. Rather than simply being based on a percentage of the service price as the commission for direct hire placements was, the consulting placement commission lost touch with the service price once it became entangled with the adjusted gross profit, which was defined as the bill rate less the pay rate plus burdened overhead, benefits, and expenses."

Appellants acknowledge that Surrex's consultant commission system "started with calculating the commission based on . . . service price," but contend that California case law precludes Surrex from utilizing any other factors in determining their commissions. In support of this contention, appellants quote *Keyes Motors*, and in particular, the *Keyes Motors* court's paraphrasing of section 204.1 as requiring that "the amount of their compensation must be a percent of the price of the product or service" (*Keyes Motors, supra*, 197 Cal.App.3d at p. 563). Appellants also cite the Supreme Court's application of this requirement in *Ramirez, supra*, 20 Cal.4th at pages 803–804.

We disagree that either the *Keyes Motors* court or the *Ramirez* court intended to preclude an employer from calculating commissions based on anything other than a straight percentage of profits. Most importantly, neither the *Keyes Motors* court nor the *Ramirez* court had any occasion to address this issue, because in both cases, the employees' commissions were based on a straight percentage of the price charged to the customer. (*Keyes Motors, supra*, 197 Cal.App.3d at p. 561 [The "mechanic earns a fixed percentage of the hourly rate charged the customer"]; *Ramirez, supra*, 20 Cal.4th at p. 804 [employee received a "percentage of the price of the bottles of water and related products sold"].) " ' "It is axiomatic that cases are not authority for propositions not considered." ' " (*Silverbrand v. County of Los Angeles* (2009) 46 Cal.4th 106, 127 [92 Cal.Rptr.3d 595, 205 P.3d 1047].) Thus, "[t]he *Keyes Motors* definition of 'commission' . . . does not control our case . . . ." (*Areso, supra*, 195 Cal.App.4th at p. 1006.)

■ Not only did the *Ramirez* and *Keyes Motors* courts not decide the issue presented in this appeal, those cases were decided on facts that are materially distinct from those present in this case. "[N]ew facts require new law." (*Areso, supra*, 195 Cal.App.4th at p. 1007.) Most importantly, the employees in *Ramirez* and *Keyes Motors* increased the profitability of their companies by increasing *revenue*. In *Keyes Motors*, the mechanics who were paid a percentage of an hourly rate to customers had an "incentive to increase their earnings by performing additional repairs." (*Keyes Motors, supra*, 197 Cal.App.3d at p. 561.) In *Ramirez*, the bottled water sales representative who was paid percentage of the price of bottles of water sold had an incentive to sell more bottles. (See *Ramirez, supra*, 20 Cal.4th at p. 804.)

In this case, in contrast, appellants affected not only the *revenue* that Surrex received, but also the *costs* that Surrex would bear. Paige Freeman, a senior consulting services manager, testified that consulting service managers negotiated both the rates that Surrex paid candidate/consultants and the rate at

which Surrex billed clients for those services.[12] Appellants therefore had an impact on both the revenue (bill rate) that Surrex received and the costs (pay rate) that Surrex incurred. Thus, while in *Keyes Motors* and *Ramirez* a commission system based on the price of the products or services provided employees with an incentive to increase the number of repairs performed (*Keyes Motors*) or the number of bottles of water sold (*Ramirez*), in this case, a commission system based *solely* on revenue or price would fail to reward employees who helped Surrex achieve greater profits by limiting costs. We see nothing in *Ramirez* or *Keyes Motors* that requires such a result, particularly since neither court had occasion to consider a compensation system similar to the one at issue in this case.

■ Appellants' contention that the term "commissions" in the relevant regulation (Cal. Code Regs., tit. 8, § 11070, subd. 3(D)) should be interpreted to include only those commissions that are based strictly, and solely, on a percentage of the price of the product or service rendered constitutes an excessively narrow and wooden application of *Keyes Motors* and *Ramirez.* Such a limited definition would not comport with the contemporary legal sense of the word "commission."[13] On the contrary, the relevant Black's Law Dictionary's definition of "commission" expressly *includes* payments derived from profits. (See Black's Law Dict. (5th ed. 1979) p. 246, col. 2 ["The recompense, compensation or reward of an agent . . . when the same is calculated as a percentage on the amount of his transactions or *on the profit to the principal.*" (italics added)].) Moreover, a commission based on profits is hardly a concept foreign to California law. (E.g., *Brawthen v. H & R Block, Inc.* (1975) 52 Cal.App.3d 139, 143 [124 Cal.Rptr. 845] [contract provided for commission of 50 percent of net profits]; *Estrada v. Darling-Crose Machine Co.* (1969) 275 Cal.App.2d 681, 682 [80 Cal.Rptr. 266] [party claimed he was entitled to "his full normal commission of 35 percent of defendant's net profit"].)

Appellants do not dispute that Surrex's commission system for consultant placements was *based on* the price of services sold, albeit not *solely* on the price. As appellants acknowledge, the Surrex commission system "started with the service price"; the amount of revenue generated by consulting services managers was a critical factor in determining the compensation that the employees received. (Compare with *Harris, supra,* 138 Cal.App.4th at p. 37 [concluding telemarketers who were paid through a commission system based on points were not exempt because "[t]he point values were *not* tied to

---

[12] Appellants acknowledge in their brief, "[consulting service managers] . . . negotiated the rates under which recruits would work."

[13] By "contemporary" we mean 1976, when the IWC first adopted the commissioned employees exemption. (Cal. Code Regs., tit. 8, former § 11215, subd. (3)(C), Register 76, No. 41-B (Oct. 9, 1976) p. 819.)

the price of the subscription sold" (italics added)].) Surrex's commission system thus fully comports with the "essence of a commission," which is a payment "base[d] . . . on sales" that is "decoupled from actual time worked." (*Yi v. Sterling Collision Centers, Inc.* (7th Cir. 2007) 480 F.3d 505, 508–509; accord, *Parker v. NutriSystem, Inc.* (3d. Cir. 2010) 620 F.3d 274, 283 ["we decline to adopt a test that requires a commission, under § 7(i) [(29 U.S.C. § 207(i))[14]], to be strictly based on a percentage of the end cost to the consumer"].)

Finally, the sole argument that appellants offer to support their contention that the term "commissions" in the commissioned employees exemption (Cal. Code Regs., tit. 8, § 11070, subd. 3(D)) should be construed as excluding commission systems such as Surrex's, is that such a formula is "too complex." Appellants' contention that the Surrex's commission system is "too complex" is neither factually accurate nor legally relevant. The formula was clearly stated in the employees' employment agreements and, in most cases, could be calculated simply by knowing the candidate's "bill rate" and "pay rate" (both of which the consulting service managers, themselves, negotiated).[15] In any event, appellants fail to cite any authority for the proposition that complexity is, or should be, a factor in determining whether a compensation scheme constitutes a commission under relevant California law.

■ Accordingly, we conclude that Surrex's commissions were sufficiently related to the price of services sold to constitute commissions for purposes of the commissioned employees exemption (Cal. Code Regs., tit. 8, § 11070, subd. 3(D)).

4. *Surrex's compensation plan constituted a bona fide commission system*

Appellants contend that they were not subject to the commissioned employees exemption because Surrex's compensation plan did not constitute a "bona fide" commission system "as a matter of law."

a. *Factual background*

After a brief startup period, Surrex paid each consulting service manager a draw ranging from approximately $3,000 to $5,500 per month. A draw is an advance on commissions to be earned in the future. Consulting service

---

[14] Title 29 United States Code section 7(i) is the commissioned employees exemption from overtime pay requirements contained in the federal Fair Labor Standards Act of 1938 (29 U.S.C. § 201 et seq.).

[15] Appellants do not dispute that in most instances, a consultant's benefits and expenses were zero.

managers earned commissions as described in part III.A.3.b.i., *ante*. Surrex paid each consulting service manager an amount in excess of the guaranteed draw whenever his or her lifetime commissions earned as of the date of that pay period were greater than the lifetime draw payments as of that same date.

### b. *Governing law*

Appellants note that the DLSE's Enforcement Policies and Interpretations Manual states, "Consistent commission earnings below, at, or near the draw are indicative of a commission plan that is not bona fide." (DLSE Enforcement Policies and Interpretations Manual (June 2002) § 50.6.1.4.) Appellants further contend that in order for this court to determine whether Surrex's commission system was bona fide, we must examine commissions *paid*, rather than commissions *earned*, because "a [consulting services manager] is only paid above the draw when *cumulative* commissions exceed cumulative draws." We assume for purposes of this decision that Surrex was required to demonstrate that sufficient numbers of consulting services managers were consistently paid amounts in excess of their guaranteed draw in order for Surrex's compensation plan to constitute a "bona fide" commission system.[16] We consider below whether appellants are correct that Surrex failed "as a matter of law" to make such a showing.

### c. *Application*

Crawford testified that during the relevant time period, "seven to ten" consulting services managers consistently received payments in excess of their guaranteed draw. In addition, one of Surrex's senior consultant service managers, Robert Bishop, testified that his annual income at Surrex over the past three years had averaged between $270,000 and $300,000—an amount far in excess of his $60,000-per-year guaranteed draw. Bishop also testified that approximately two-thirds of Surrex's current workforce had been paid commissions in excess of their draws. David Hattman, another Surrex consulting service manager, testified that he "routinely" received compensation in excess of his draws. In light of the foregoing evidence, we reject appellants' contention that Surrex's commission system "was not bona fide as a matter of law."

---

[16] We reject appellants' contention that Surrex was required to demonstrate that its commission system was bona fide when applied only to the 10 *class members*, rather than to the 39 consulting service members who worked for Surrex during the relevant time period. We agree with the trial court's observation that, "The test cannot be limited to whether any one or group of employees actually was able to realize income in excess of their draw. To so hold would be to reward the unmotivated or certainly the unproductive employee." To the extent that *Herman v. Suwannee Swifty Stores, Inc.* (M.D.Ga.1998) 19 F.Supp.2d 1365 supports the contention that Surrex could demonstrate a bona fide commission plan only by showing that *class members* were paid commissions in excess of the draw, we decline to follow *Herman*.

B. *The trial court did not err in denying appellants' missed meal period claim*

Appellants contend that the trial court erred in denying their claim for missed meal periods. Specifically, appellants claim that the court erred in concluding that Surrex "only had to provide for such breaks, even if they were not taken."

 In *Brinker*, the Supreme Court held that an employer need only *provide* for meal periods, and need not *ensure* that employees take such breaks. The *Brinker* court stated in part:

"An employer's duty with respect to meal breaks . . . is an obligation to provide a meal period to its employees. The employer satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so. What will suffice may vary from industry to industry, and we cannot in the context of this class certification proceeding delineate the full range of approaches that in each instance might be sufficient to satisfy the law.

"On the other hand, the employer is not obligated to police meal breaks and ensure no work thereafter is performed. . . ." (*Brinker, supra,* 53 Cal.4th at pp. 1040–1041.)

Accordingly, we conclude that the trial court did not err in denying appellants' missed meal period claim.[17]

---

[17] In their supplemental brief, filed after transfer from the Supreme Court, appellants concede that the *Brinker* court "answered [their claim on appeal] in the negative." However, appellants request that we remand this case to the trial court for a determination as to whether Surrex discouraged its employees from taking meal breaks. Appellants acknowledge that they did not "explicitly raise[]" this issue in their initial appeal, but request that they nevertheless be permitted to do so now under the theory that this argument depends on a "new rule of law" announced in *Brinker*.

Appellants failed to raise this issue in their initial briefing on appeal. Further, prior to the *Brinker* decision, there were a number of cases that appellants could have cited in support of this theory in filing their opening brief on appeal in March 2011: "[A]n employer may not undermine a formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks. (*Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 962–963 [35 Cal.Rptr.3d 243]; see also *Jaimez v. Daiohs USA, Inc.* [(2010)] 181 Cal.App.4th [1286,] 1304–1305 [105 Cal.Rptr.3d 443] [proof of common scheduling policy that made taking breaks extremely difficult would show violation]; *Dilts v. Penske Logistics, LLC* (S.D.Cal.2010) 267 F.R.D. 625, 638 [indicating informal anti-meal-break policy 'enforced through "ridicule" or "reprimand" ' would be illegal].) The wage orders and governing statute do not countenance an employer's exerting coercion against the taking of, creating incentives

## IV.

## DISPOSITION

The judgment and postjudgment order awarding costs are affirmed. Surrex is entitled to costs on appeal.

McConnell, P. J., and McIntyre, J., concurred.

---

to forego, or otherwise encouraging the skipping of legally protected breaks." (*Brinker, supra,* 53 Cal.4th at p. 1040.)

Accordingly, we decline appellants' request that they be permitted to raise a new issue at this time. (*Dahms v. Downtown Pomona Property & Business Improvement Dist.* (2009) 174 Cal.App.4th 708, 711, fn. 1 [96 Cal.Rptr.3d 10] ["Any arguments that could have been raised in the original briefs . . . but were not raised until the supplemental briefs [(upon transfer from the Supreme Court)] will not be considered"].)