Filed 9/8/20  Richardson v. Ruan Transport Corp. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| BOBBY RICHARDSON, | F076850 |
| Plaintiff and Appellant, | (Super. Ct. No. 265882) |
| v. | |
| RUAN TRANSPORT CORPORATION, | **OPINION** |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Tulare County.  Bret D. Hillman, Judge.

Wagner, Jones, Kopfman & Artenian, Andrew B. Jones, Daniel M. Kopfman, Lawrence M. Artenian, Angela E. Martinez; Peter S. Bradley, for Plaintiff and Appellant.

McDermott Will & Emery, Ellen M. Bronchetti and Philip Shecter, for Defendant and Respondent.

-ooOoo-

## **INTRODUCTION**

This is a wage-and-hour misclassification case. Appellant Bobby Richardson (Richardson) is seeking overtime wages, among other items of damage, for his former employer's purported failure to properly classify him as a nonexempt employee.

Richardson initially filed a complaint with the Division of Labor Standards Enforcement (DLSE); the Deputy Labor Commissioner concluded Richardson was misclassified as an exempt employee. Richardson's employer, Ruan Transport Corporation (Ruan), appealed and sought a trial in Tulare County Superior Court.

Following a bench trial de novo, the trial court concluded Richardson had been properly classified as an exempt employee of Ruan. We affirm.

## **MOTION TO AUGMENT THE RECORD**

"When practicing appellate law, there are at least three immutable rules: first, take great care to prepare a complete record; second, if it is not in the record, it did not happen; and third, when in doubt, refer back to rules one and two." (*Protect Our Water v. County of Merced* (2003) 110 Cal.App.4th 362, 364.)

Richardson filed a motion to augment the record to include the trial court's statement of decision following the bench trial. Because of the importance of the trial court's statement of decision in facilitating appellate review, this issue must be addressed first.

In January 2018, Richardson designated the items to be included in the record on appeal. While he requested inclusion of the December 22, 2017 judgment, he did not request inclusion of the December 22, 2017 statement of decision. The record on appeal was filed in August 2018, and an extension of time to file Richardson's opening brief was granted in September 2018. On November 14, 2018, Richardson's counsel asked Ruan's counsel via email to stipulate to augment the record with the statement of decision. Ruan did not stipulate, and Richardson filed his opening brief on November 30, 2018, without requesting augmentation. Ruan's responsive brief was filed on April 2, 2019, and

2

asserted the failure to include the statement of decision was fatal to the appeal. Richardson filed a reply brief on May 20, 2019, asserting the statement of decision was unnecessary to support his claims of error, which he argues are entirely legal and supported by the trial testimony in the reporter's transcript of the trial proceedings.

Then, on July 18, 2019, Richardson filed a motion to augment the record with the statement of decision, which he had inadvertently failed to designate as part of the record on appeal, representing it would assist with appellate review but was not categorically necessary for it. Ruan opposed this motion arguing it was untimely, not taken in good faith, and would prejudice Ruan because the request was filed after the briefing was completed. Ruan also noted the statement of decision provided with the motion to augment was not a certified copy, as required by our Local Rules. Richardson filed a reply brief stating the following in relevant part:

> "Contrary to Ruan's claim, Richardson has shown good cause. Specifically, Richardson was not aware of the omission of the Statement of Decision until after receiving Ruan's Respondent's Opening Brief, whereupon Richardson requested that Ruan agree to augment the record. Richardson's refusal was then the cause for seeking to augment the record."

This is simply untrue. The email correspondence attached to Ruan's counsel's declaration in opposition to the motion to augment the record clearly shows Richardson's counsel was aware of the omission of the statement of decision even before Richardson's opening brief was filed. Upon Ruan's refusal to stipulate, no request to augment the record was made with the opening brief or with Richardson's reply brief. In fact, no request to augment the record was made until two months after the reply brief was filed. Meanwhile, although there is no dispute about its authenticity, the copy of the statement of decision accompanying the motion is, in fact, not certified.

California Rules of Court, rule 8.155(a)(1), states that "[a]t any time, on motion of a party or its own motion, the reviewing court may order the record augmented to

3

include:  [¶]  (A) Any document filed or lodged in the case in superior court."  The Local Rules of the Court of Appeal Fifth Appellate District state that requests for augmentation of the record should be requested within 40 days of filing the record.  "Thereafter, motions to augment will not be granted except upon a showing of good cause for the delay."  (Ct. App. Fifth Dist., Local Rules, rule 1(b).)

Under the circumstances here, Richardson's request to augment the record is denied.  While the rule allowing record augmentation "is to be construed liberally" (*People v. Brooks* (1980) 26 Cal.3d 471, 484, citing an earlier version of Cal. Rules of Court, rule 8.155 [formerly rule 12]) requests for augmentation made after a reasonable time has expired from receiving the record on appeal will be denied absent a strong showing of unusual or unavoidable circumstances giving rise to the delay (*People v. Preslie* (1977) 70 Cal.App.3d 486, 492).

Richardson's motion was not filed within a reasonable timeframe, and no good cause has been shown for the delay, especially given Richardson's counsel's knowledge of the omission before any of the briefs were filed.  Augmentation at this point would cause delay to allow any necessary supplemental briefing and additional expense to Ruan.

How the absence of the statement of decision affects the viability of Richardson's arguments is considered below.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  *Procedural Background*

This case originated with Richardson's claim for unpaid wages with DLSE on October 16, 2015, against Ruan.  The DLSE found Richardson had been misclassified, issued a decision in his favor, and awarded a total of $61,901.90.  Ruan filed an appeal in the Tulare County Superior Court, posting a bond.  A three-day bench trial was held on September 18 to 20, 2017.  On November 8, 2017, the trial court issued a tentative decision in favor of Ruan, concluding Richardson had been properly classified as an

4

exempt administrative employee. On December 22, 2017, the court issued a statement of decision, and a judgment was entered. No objection to the statement of decision was made by Richardson. This appeal followed.

## II. Trial Proceedings and Testimony

Ruan initiated an appeal of the Deputy Labor Commissioner's decision pursuant to Labor Code section 98.2. "The timely filing of a notice of appeal forestalls the commissioner's decision, terminates his or her jurisdiction, and vests jurisdiction to conduct a hearing de novo in the appropriate court." (*Post v. Palo/Haklar & Associates* (2000) 23 Cal.4th 942, 947.) "Although denoted an 'appeal,' unlike a conventional appeal in a civil action, hearing under the Labor Code is de novo. [Citation.] '"A hearing *de novo* [under Labor Code section 98.2] literally means a new hearing," that is, a new trial.' [Citation.] The decision of the commissioner is 'entitled to no weight whatsoever, and the proceedings are truly "a trial anew in the fullest sense."'" (*Id.* at pp. 947–948.) Testimony from the resulting three-day trial is provided below.

### A. Ruan's Milk Transport Operations Out of Tulare Terminal

There was general agreement throughout the testimony of Richardson's and Ruan's witnesses regarding the logistics of Ruan's milk transport operations through the Tulare terminal.

#### 1. Ruan's Farm Pickup Operational Logistics

Ruan is a nationwide freight transfer company; part of its business is based on milk transport, which, because it is a perishable product, it is different than other types of freight transport. Ruan has multiple terminal locations throughout California involved in milk transport. Through the Tulare terminal location, Ruan performs farm pickups of raw milk and delivers the milk to various plants/creameries where the milk is processed into different types of dairy products. The largest customer Ruan serves through that terminal is California Dairy, Incorporated (CDI). When Richardson was transportation supervisor, approximately 75 percent of the milk delivered through that terminal was

5

transported for CDI. The Tulare terminal services approximately 50 to 60 discrete dairies; Ruan's creamery customers, including CDI, direct how many loads of milk are to be delivered, sometimes from particular dairies, to various plants for processing.

The timing of pickups and deliveries is critical from a customer-service standpoint, but also in terms of Ruan's profits. Picking up milk from a dairy must be precisely timed, and must also be adjusted for seasonal variations in the amount of milk farms produce. Cows have to be milked; that milk is stored by the dairy in a bulk tank until a pickup. The dairies' tanks have to be sanitized for the dairies to receive quality bonuses – without sanitization, the bacteria counts become too high and quality bonuses are lost. Pickup timing matters in several respects, both to the dairy and to Ruan. If the pickup is too early, the driver loses time waiting, or the load is undersized, causing inefficiency in hauling costs. If the pickup is too late, the bulk tank may become full during the milking process, and milk will have to be "spilled" – i.e., dumped on the ground. Dairies might also lose a viable window to clean the tank, causing a loss of quality bonuses. Some dairies have set schedules for pickups, some do not. Dairies may encounter issues that require changes in pickup frequency or timing, and they will contact Ruan to make adjustments to these pickups.

On the delivery side, plants may experience backups, drivers may have to wait in line to make deliveries that create scheduling delays, or load adjustments to a particular plant must be made. Truck trailers have to be sanitized every 24 hours to maintain the quality of milk being hauled. Wash tags are used to track this sanitization schedule. If wash tags expire while milk is being hauled, the milk is downgraded to a different class and it may have to be delivered to a different plant to undergo alternative processing. This can result in losses to Ruan if it is responsible for an expired wash tag. While trucks are usually washed at the creamery, an expired wash tag may require Ruan to pay the costs of a wash. Beyond the sanitization schedule for trucks, drivers are limited to 14

6

hours of service in a day. Changes to delivery schedules or routes must accommodate the driver's hours-of-service limitation.

Creameries/plants may experience difficulties or changes in production schedules that require milk to be rerouted. Customers like CDI may also change the number of loads of milk they require at different creameries/plants for a variety of reasons, which in turn, requires Ruan to reroute deliveries. These types of modifications occur frequently on each shift, and adjustments to driver routes are a common occurrence.

Ruan's profit margin on milk transport is thin. Up to 65 percent of every dollar earned by Ruan is spent on drivers' wages; after paying for the costs of transport and other operating costs, Ruan's costs comprise 92 cents of every dollar it takes in, which translates to about a 10 percent profit margin. Therefore, maximizing loads, calculating efficient routes, eliminating empty miles (a truck that is empty), and maintaining precise timing for pickups is especially critical to the profit margin.

### 2. Dispatcher's Coordination of Pickups and Deliveries

Ruan coordinates dairy pickups and plant deliveries through dispatchers located at the Tulare terminal who use a computer software program called RedTrak. RedTrak utilizes geofencing technology and displays the various routes, plant wait times, farm pickup sites, and delivery sites – this digitally-displayed configuration is referred to as "the board." Each shift's schedule is preset based on basic parameters of loads requested, drivers scheduled, and pickup times required. However, as a shift progresses, any number of variables require changes to this preset schedule. Dispatchers are able to make changes to the board by clicking, dragging, and rearranging these preset routes. Truck drivers have cellphones that are linked through satellite to RedTrak – if dispatchers change routes, messages will be relayed to the drivers through the cellphone. While RedTrak helps dispatchers plan and oversee pickup and delivery schedules by providing information such as when a driver's shift began and when a driver's service hours expire, the program does not assist with ensuring full loads, meeting customer load counts, or

7

automatically recalculating routes to maximize efficiency. It also does not account for the most profitable distribution and management of drivers and their hours, or how to meet customer needs.

### B. Witnesses for Richardson

#### 1. Richardson

Richardson was employed by Ruan as a transportation supervisor between April 2012 and July 2015, overseeing approximately 40 truck drivers per shift who picked up milk from farms and delivered it to creameries for processing. Each truck driver had approximately four routes to complete on a shift. As a supervisor, Richardson was to decide how to most efficiently direct drivers to complete these pickups and deliveries, and he utilized RedTrak for this.

Determining what plant/creamery a driver was sent to was based on a series of factors including time, if the driver could make the dairy pickup window, and the proximity of the creamery to the farm where pickup occurred. Each driver had a license for which drivers took responsibility. Drivers had to be responsible for determining whether there was sufficient time on their wash tags[1] to complete their current route. Richardson kept track of drivers' start times to ensure they did not exceed their 14-hour driving limit.

When Richardson arrived at work, the dairies where milk was to be picked up were already decided. The dayshift was responsible for setting up the initial schedule, but Richardson would have to make changes as needed during the course of his shift. If, after evaluating the way the setup had been done by the dayshift, he could make changes if he determined there was a more efficient way to perform the pickups and deliveries. He would independently direct those changes without prior approval from anyone else.

---

[1] Wash tags refer to how many loads a driver could haul in a 24-hour period without sanitizing their truck. They sterilize the truck every 24 hours.

When Richardson started his own shift, drivers might be in the middle of their own shifts. Richardson might reconfigure the assignments to deal with expiring wash tags. Drivers were not permitted to refuse his instructions, nor could they decide what pickup and deliveries to make.

If Richardson dispatched a driver in a way that exceeded the hours of service, that could result in fines to Ruan or the revocation of a terminal DOT (Department of Transportation) license. When necessary, Richardson would remind drivers they needed to comply with the hours-of-service requirements. His basic function was to note drivers' start times, and see how they were running their series to make sure they did not exceed their 14-hour shift maximum. He never recalled disciplining a driver on an hours-of-service violation.

It was also Richardson's responsibility to make sure drivers were taking meal breaks. In prior testimony, Richardson had indicated he had to adjust drivers' schedules at times to accommodate meal breaks. As a supervisor, he could grant that request or ask that drivers take their break at a later time.

Ruan's major customer with whom Richardson worked most was CDI. Richardson's responsibility was to maintain a strong relationship with CDI and remain responsive to CDI's needs. CDI would provide daily "counts" or loads needed at a particular creamery; the counts could change multiple times per day. The counts would be set at the beginning of his shift, but with changes to counts made by CDI throughout the shift, Richardson would have to reconfigure which loads by which drivers were delivered to which creameries. Richardson had to do everything he could to comply with CDI's requests to change a count. CDI would tell Richardson where extra loads were to go, and then he would rearrange drivers and routes as required. He had to do this in a way that was operationally efficient, kept empty miles to a minimum, and still met pickup windows at the dairies. If milk was not picked up on time from the dairy, bulk tanks could overfill, milk would be "spilled," and Ruan would have to cover the costs. In some

9

cases, Richardson would have to change the schedule of many drivers to accommodate changes to counts.

Richardson was expected to be courteous in his discussions with customers such as CDI; when he spoke to them, he was speaking on behalf of Ruan and any rudeness would negatively impact Ruan's reputation. If there was a problem the customer had, Richardson was required to come up with a solution he thought might work. Richardson remembered one instance of a request he could not cover.

There were times when Richardson had to dispatch loads of milk to Los Angeles for CDI upon request. It was Richardson's duty to determine whether he could accommodate that request based on what was going on, but he would not need prior approval before authorizing a driver to take a load to Los Angeles for CDI.

There was always another person on the night shift with Richardson. Sometimes that person was a dispatcher, a driver who was covering for a dispatcher, or another transportation supervisor. He also occasionally had a dispatch supervisor work with him at night. The other person worked with another customer, Dairy Foods of America. Richardson testified his job duties as transportation supervisor were identical to that of dispatcher.

Richardson did some training of other dispatchers, but it was so busy on his shift that those trainees often had to simply watch and absorb what Richardson was doing. When Richardson could take a break, he would give those trainees guidance. The length of training was dependent upon the trainee's abilities and experience level.

Drivers' equipment was set up at the plants at the start of the drivers' shifts, not the terminal. The number of drivers was set by upper management, and Richardson dispatched based on what was pre-decided with respect to equipment and scheduled drivers. The "309 drivers" would get in whatever truck was available when they reported

for work at their assigned creamery.[2] Equipment was not kept at the terminal for 309 drivers because if it sat in the terminal yard, it was not being utilized for loads. Richardson's job required him to make sure equipment was utilized. When there were multiple trailers in the yard, Richardson had to evaluate which trailer to direct the driver to use to get maximum utilization out of that trailer; this decision could impact the amount of time the trailer was on the road making money for Ruan.

Another of Richardson's responsibilities was to deal with a customer when a driver's wash tag expired. If a wash tag expired at a time the driver was carrying a load, Richardson would receive notification from CDI, and Richardson would be expected to reroute that milk to a different plant for processing, as the milk was downgraded due to the expired wash tag. The trailer would have to be sanitized, which could take two or three hours, and while that was occurring, Richardson would have to determine how to cover impacted routes and reconfigure drivers for coverage. Most plants washed the trailers themselves, and the customer would tell Richardson what the customer's preference was in those circumstances. If Ruan had to wash the truck itself, that would cost Ruan extra money.

Accidents were another variable Richardson had to navigate in his discretion. He had to call his supervisor on two occasions related to accidents: one accident caused severe disability, the other was fatal. In the event of accidents, Richardson would complete the first report. When an accident with a truck occurred, Richardson would have to readjust the drivers' assignments to ensure that no milk was spilled. It was his job to mitigate the effects of the accident on the routes. He also had to navigate backups

---

**2**     Two different groups of drivers were dispatched out of the Tulare terminal: 504 drivers and 309 drivers; these two groups of drivers had different collective bargaining agreements with Ruan. The 504 drivers were utilized for transports to Los Angeles, and the 309 drivers were for local runs. Richardson testified they did not want cross-over among the two groups.

at a plant, long lines to unload milk, equipment breakdowns, or plants changing the type of product they were processing which could result in delays. He made changes to meet the challenge presented and ensure Ruan's profits were maximized.

Richardson's main concerns involved being timely with pickups at dairies and not having drivers work over their 14-hour work limit. He was not particularly concerned with managing overtime. He would call management if the changes he was making would impact the next day, or if he could not accommodate a customer's request to make count changes. For the most part, however, Richardson did not have to obtain management approval before rerouting drivers during his shift. The changes he made were not written in a manual, nor was there a certain protocol for making changes.

Richardson would look at RedTrak to identify opportunities to improve efficiency of the operation and to optimize the direction of drivers to ensure profitability. It was also part of Richardson's job to understand his customer's needs and the services he could offer to maximize profits for Ruan, and he used his independent judgment to create solutions to meet those objectives. He would make service suggestions to dispatch supervisors or dispatch managers.

Richardson completed a self-evaluation in 2013 indicating his job duties were to provide timely and thorough pass-down information to his team members to ensure and enhance the operation's effectiveness; he would follow up on changes to identify whether the changes were successful or required refinement. He was in constant communication with drivers during the shift to ensure safe and efficient work habits; he monitored his drivers' hours and tried to optimize the schedule to ensure they were not exceeding their company or DOT limitations. He followed up with drivers to ensure safety issues were resolved in a timely and effective manner.

As a transportation supervisor, Richardson's job required him to issue verbal disciplinary warnings to drivers if he observed them doing something prohibited. Disciplining drivers was part of Richardson's responsibilities. Richardson would coach

12

drivers to address issues with driver conduct. He had some input into what discipline a driver would receive; but the level of discipline was left to the dispatch supervisors.

Richardson was involved in discipline of drivers, he would sign citations, and meet with drivers to go over discipline reports. Richardson recalled an attendance matter and an instance when a driver damaged a truck at a plant. Richardson testified he would not recommend any particular form of discipline, but that he started the disciplining paperwork. Richardson felt he had authority to send a driver home if he thought it was necessary.

It was among Richardson's daily job duties to ensure drivers were following safe protocols, and to enforce Ruan's safety policies and protocols. Richardson understood he was to participate in accident-cause investigations should they become necessary. His job was to gather information so the company could determine whether the accident had been avoidable and how to make better safety policies. If Richardson did not have time to perform a root-cause investigation, it would get passed to the dispatch supervisor working on the day shift.

Richardson did not attend management meetings, which were held during the day; policy decisions were not made at night. CDI met with dispatch managers and the terminal manager during the day throughout the week to discuss any problems. Richardson would call his supervisor if he was going to have a problem making the requested counts, or if there may be a problem making the counts the following day, or when drivers were taking loads to Los Angeles – particularly if that could not be accomplished. In one instance, there had been a power outage and CDI requested six out-of-service trailers be put in place. Richardson did not have the authority to make that decision. As for drivers, Richardson might go weeks at a time without seeing them.

Richardson did not have the authority to implement his own system of delivery or pickups, he was required to work through RedTrak; he could not enter into any contracts on behalf of Ruan; he did not address issues directly with the dairies, although he was the

13

dairies' contact to report problems. The field representative would follow up with dairies if there were issues. He did not oversee any maintenance of equipment, there was a separate department for that. He did not determine whether accidents were preventable or whether there should be a safety determination made. He had no independent authority to hire or fire employees; he did not set rates of pay for anyone, or oversee anyone's hours (other than service hours of drivers); he never had anything to do with accounting, auditing, or financial budgets; he did not do any procurement, quality control, purchasing, advertising, or marketing. He had no authority to change farm pickup practices, decide not to service a dairy, or to not deliver milk to a creamery.

After Richardson was asked to document his time, Ruan changed his title to dispatcher in 2015, and he worked hourly, but very few of his duties changed with the job title adjustment, although other supervisors took over the communication with CDI during his shift.

### 2.    *Phil Radosevic*

Radosevic was employed by Ruan between 2012 and 2014 as a transportation supervisor on the day shift. He largely corroborated Richardson's testimony about the duties required by the position.

Radosevic did not design discipline for employees, although he participated in delivery of disciplinary write-ups to drivers. He did not have any influence on Ruan's contracting; the salary, pay, or hours of any employees; he did not direct truckers in the details of checking tanker cleanliness or direct them how to keep their DOT logbooks for their hours of service. Radosevic did not hire or fire employees. Other than gathering information for accident reports, he did not investigate to determine whether discipline should result from an accident.

Radosevic also had nothing to do with broad policy decisions by Ruan related to safety or maintenance of equipment; he had nothing to do with budget, legal compliance, taxes, accounting, insurance, quality control, auditing, purchasing, advertising, or

14

marketing.  In his position, he did not make any decisions about whether to serve a particular dairy or to deliver milk to a creamery; all of those decisions were made by upper management located in Iowa.

Radosevic had been a dispatcher before he became a transportation supervisor, but none of his duties changed with the job title change.  His job duties included communicating with drivers about assignments, talking with dairymen about changes to pickups; Radosevic felt it was part of his job to figure out how to accommodate customer requests and then how to rearrange drivers and routes to make that happen.

Radosevic had no authority to write up drivers for violating company policy.  At times, he would start a form regarding an accident or an incident, and then it would be passed along to the terminal manager – that was Radosevic's extent of involvement.  Although, in prior testimony, Radosevic had stated he had the authority to write someone up.  If management sent him a warning letter to deliver to a driver, he would hand the letter to the driver, but Radosevic never issued the warning letters or met with the driver to review disciplinary action.  However, Radosevic had signed correction letters issued to drivers regarding various failures to maintain compliance with company policies; he had also attended sexual harassment training for supervisors.

Radosevic indicated a transportation supervisor was concerned with picking up milk timely so that it did not spill and so a dairyman would not lose a quality bonus.  The quality bonus could be lost if a transportation supervisor did not provide adequate time for the dairyman to wash his tank.  Radosevic did not need any approval to order additional milk pickups requested by a dairyman.

### 3. *Claude Balaam*

At the time Richardson started working for Ruan in 2012, Balaam was an operations manager and he oversaw several terminals for the company.  In July or August 2015, Balaam became a senior scheduler.  He was also involved with safety, although he was not the head of the safety department.  As operations manager, he managed

15

everything to do with transportation. When he became senior terminal manager, he had fewer terminals to oversee, but he had the same types of duties. Sam Schott was the director of operations, and Balaam reported to him.

Balaam testified that while Richardson did not create Ruan's business objectives or manage personnel, Richardson could make suggestions. According to Balaam, Richardson had the authority to discipline drivers by sending them home; Richardson was expected to manage issues with the customers, resolve customer concerns, and manage the routes and deliveries in a way that would be most profitable for Ruan's Tulare terminal. Richardson was to run the board however he believed was most efficient, and he was expected to counsel drivers if he saw them doing something inappropriate. Richardson was also responsible to ensure drivers were complying with their hours-of-service limitations. Richardson did not have to obtain prior supervisor approval for any of those activities, and he was the highest level supervisor on site at night.

Richardson was to use his independent judgment to make decisions that would help Ruan profit – if there were changes to load counts or a dairy that needed a pickup, Richardson was to meet those needs in the most efficient way possible. Richardson had significant discretion to make the decisions necessary to meet the customer's and Ruan's needs, which impacted the financial profits of Ruan at that terminal location. RedTrak was used by dispatchers and Richardson to dispatch drivers and set deliveries for the shift; the board would identify the location of a pickup, the location of a driver, and this would be used to determine who was closest to handling the route most efficiently. RedTrak was set up on the day shift under a best-case scenario; then it had to be adjusted throughout the shift to meet all the variables.

## C. Testimony of Ruan's Witnesses

### 1. Sam Schott, Operational Leader for Ruan

Schott was an operational leader for Ruan, who had been working for the company for 25 years. He oversaw multiple locations throughout the state, he had profit and loss responsibilities, and he considered acquisitions.

When he worked as director of operations, he traveled extensively between various terminals; his main office was located in Tulare, which was where Richardson worked.

Schott had never worked as a transportation supervisor, but he was a dispatcher for KCTL (Kings County Truck Lines) before it was purchased by Ruan. In that position, he had the same duties as Richardson, and he was classified as exempt. He believed Richardson's main responsibility was to ensure customer service, on-time pickups and deliveries, driver management, and route management, all performed safely. Richardson was in charge of operations at night, and it was his responsibility to be the point of contact for CDI, make any load changes requested, plant-change requests, order any other changes, and resolve issues that arose at any of the dairies.

No one beside Richardson was in charge of customer relations with CDI on the night shift. At the time, Ruan's milk transport business was 70 to 75 percent from CDI, at the time of trial it was closer to 90 percent. Thus, Richardson's handling of CDI's milk transportation was critical to Ruan's business.

Transportation supervisors over the years had contributed to the development of RedTrak, a proprietary system that Schott himself developed. These transportation supervisors made suggestions about how the boards displayed information related to the dairies; there were suggestions about moving to multiple monitors so that multiple dispatchers could see the same system simultaneously; then it was integrated with phones. They kept having dispatch meetings to talk about what the dispatchers would like to see from the system.

17

RedTrak was limited, however, in that it did not tell transportation supervisors how to safely manage the fleet of drivers or tell supervisors what hours of service the driver had remaining; it also did not provide information about traffic or weather conditions, and milk production times at dairies. It did not automatically redirect changes to minimize wasted empty miles, it did not ensure load efficiency or consider wash tag expirations, and it did not redistribute work to drivers.

The Tulare terminal served 50 to 60 discrete dairies and approximately 10 to 25 different creamery plant locations. There were no regular routes assigned to drivers; only 5 percent of the plants had fixed delivery times; and some plants could only produce one product at a time, thus that impacted how they received milk if plants made a product change, for which Ruan did not always receive advance notice. Dairies also changed how much milk was to be picked up, and dispatchers would have to understand these changing needs and respond during a shift.

Rates Ruan charged were based on pounds hauled per dairy; loads changed quite a bit, sometimes product could vary by two million pounds, but that was extreme. Ruan did not make any money from trailers which were moved empty. Driver management was the largest cost to the company, so it was critical to the financial success of the business that transportation supervisors managed the time spent hauling loads, getting to a dairy on time to prevent spilled milk from overfilled dairy bulk tanks. One load of milk product was worth approximately $8,400. Driver labor costs to Ruan made up 65 cents of every dollar the company took in; managing driver time was critical to this margin. The overall profit margin was slim – 92 cents of every dollar taken in went toward Ruan's costs.

Schott described that driver management, timing and load management, and customer service were the core functions Richardson oversaw. Transportation supervisors were to manage the time drivers spent on their routes. Driver management was critical to maintaining customer service – both in terms of delivery to CDI of the

18

correct loads, and in terms of pickups at dairies. If drivers picked up loads from dairies too early, the driver was left waiting and time was wasted. If drivers were too late, the dairy may have to spill milk because it did not have storage capacity. Also, if drivers were late to dairies, dairies may have insufficient time to sanitize storage tanks, and the diary would lose its quality bonus, which could be $18,000 to $20,000. Ruan had to pay for loss of these bonuses in the past when Ruan drivers did not manage to pick up the milk from the dairy timely. If milk was picked up by a truck with expired wash tags, the milk was downgraded in quality, had to go to a different processing plant, and Ruan would have to pay the difference. If this service was not managed properly, dairies could request other haulers because of poor service. Ruan's contracts with CDI could also be canceled by CDI if deliveries were not properly managed. It was Richardson's job as transportation supervisor to maximize loads, make sure drivers managed their wash tags properly, and make sure the workforce was directed efficiently. If those things did not happen, the profit margin was diminished.

Richardson had a favorable relationship with CDI, and the customer always had good things to say about him; CDI trusted his oversight on the night shift. There was a CDI liaison between Richardson and CDI, and there was a field representative who would visit dairies to resolve issues that came up; if the transportation supervisor resolved an issue, the field representative would follow up to make sure the dairy was satisfied. The field representative would take direction from the transportation supervisor on some of these issues.

When Richardson was a supervisor, an hourly dispatcher was regularly scheduled to work with him, but the dispatcher was not expected to manage the Tulare operations; it was expected Richardson would perform all terminal operation oversight on his shift. As a supervisor, Richardson was expected to enforce driver attendance; drivers could not ignore the transportation supervisor, they could not hang up on dispatch or refuse to take

19

part in checkout reviews. Supervisors also interviewed drivers if there was a wash tag error.

Richardson was encouraged to attend weekly management meetings, and he attended training on meal and rest break requirements in California; Richardson was also expected to attend monthly webinars.

In 2015, the transportation supervisor position was eliminated and replaced with a dispatch manager position. The distinction was that dispatch managers were to be paired with an hourly dispatcher, so dispatchers could focus on the logistics portion of the business while dispatch managers would focus on driver discipline and customer interaction. When that occurred, Richardson was offered a dispatcher position with comparable compensation so that he was not taking a step backwards. By keeping him hourly exempt, Ruan could still have him manage some of the things that dispatch managers might normally supervise and allow Richardson to continue to make independent decisions about dispatching activities.

After Richardson was moved to a dispatcher position, he had the same authority to make any adjustments for load counts, and he was still responsible to be efficient with respect to dispatching drivers, timely pickups at dairies, and proper delivery of loads to creameries. He continued the use of RedTrak using the same procedures as he did when a transportation supervisor. He still had to report unsafe behavior by drivers. Sometimes drivers worked as dispatchers, and they were paid hourly with overtime when it occurred.

### 2.      *Rochelle Borg*

Borg testified she had a long employment history with Ruan. She first started in February 2006, but had worked for KCTL since 1999, a company Ruan acquired in 2006. In 2008, she was promoted to a terminal manager position in Bakersfield, and then she was transferred to be a transportation supervisor in Tulare in August of that year. She transferred back to Bakersfield in a different position, and then came back to Tulare as an assistant terminal manager in 2012. In 2014, she became dispatch manager in Tulare.

20

When Richardson was transferred to the dispatcher position in 2015, this was the first time she worked with him on the night shift. When Richardson was a transportation supervisor, she supervised him as assistant terminal manager; he was expected to perform his duties without hands-on oversight. He was directly responsible for CDI; he had the authority to cancel loads and could make that decision without approval from anyone else. Borg was responsible for handling CDI during the day; she would generally receive one to five calls from them per day.

Richardson made decisions that directly impacted profitability; he was constantly routing and rerouting drivers based on his judgment about what was most profitable and efficient. He trained other employees, one of whom shadowed him for two months, training as a dispatcher. Richardson's duties, in Borg's opinion, were related to Ruan's general business operations.

Borg's job as assistant terminal manager carried the same duties as her job as dispatch manager; she preset routes on a template for drivers; drivers would bid on start times. The template routes would never stay the same; drivers were routed and rerouted all day and night according to inventories at dairies and varied delivery locations. In a prior deposition, Borg testified she managed all dispatchers and drivers as dispatch manager; she set the schedules for the dispatchers.

### D.     Post-Trial Proceedings

The trial court issued a tentative decision on November 8, 2017, concluding Richardson was properly classified as an exempt administrative employee under Industrial Welfare Commission (IWC) Wage Order No. 9-2001 (Wage Order 9), codified at California Code of Regulations, title 8, section 11090. The court ordered Ruan to submit a proposed statement of decision.

On December 12, 2017, Ruan filed the proposed statement of decision, but Richardson did not make any proposals for changes or objections to it. On December 22, 2017, the court issued a statement of decision concluding Ruan had met its burden of

21

establishing Richardson was an exempt administrative employee. Also on December 22, 2017, the court entered judgment in accordance with the statement of decision. No motion for a new trial, nor motion to vacate the judgment was filed, and this appeal followed.

## DISCUSSION

### I.     The Administrative Exemption under Wage Order 9-2001

California law presumptively entitles employees to overtime pay if they work more than eight hours a day or 40 hours a week. (Lab. Code, § 510, subd. (a).) California law also entitles employees to meal and rest breaks. (See generally Lab. Code, §§ 226.7, 512.) However, the Legislature authorized the IWC to establish exemptions for various categories of employees, including "administrative" employees, where the employee "is primarily engaged in the duties that meet the test of the exemption." (Lab. Code, § 515, subd. (a).)[3]

Wage Order 9, codified at California Code of Regulations, title 8, section 11090, governs workers employed in the transportation industry. Workers employed in an executive, administrative, or professional capacity are exempt from sections 3 through 12 of Wage Order 9, which includes provisions regarding overtime compensation, meal and rest periods, and related recordkeeping requirements, among other things. (Cal. Code Regs., tit. 8, § 11090, subd. (1)(A).)

As relevant here, employees are exempt as an "administrative" employee if (1) their duties and responsibilities involve the performance of office or non-manual work directly related to management policies or general business operations of their employer or their employer's customers; (2) they customarily and regularly exercise discretion and independent judgment; (3) they perform under only general supervision work along

---

[3]     The IWC was defunded in 2004, but its wage orders remain in effect. (*Batze v. Safeway, Inc.* (2017) 10 Cal.App.5th 440, 471.)

22

specialized or technical lines requiring special training, experience, or knowledge; (4) they are primarily engaged in duties meeting the test of the exemption; and (5) they earn a monthly salary at least two times the state minimum wage for full-time employment. (Cal. Code Regs., tit. 8, § 11090, subd. (1)(A)(2).)

"The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order:  29 C.F.R. Sections 541.201-205, 541.207-208, 541.210, and 541.215."  (Cal. Code Regs., tit. 8, § 11090 (1)(A)(2)(f).)  The California Supreme Court held in *Harris* that only the version of the federal regulations in effect as of the effective date of Wage Order 9, January 1, 2001, are applicable.  (*Harris v. Superior Court* (2011) 53 Cal.4th 170, 178-179 (*Harris*).)

"[I]n light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection."  (*Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 702.)  Thus, exemptions from statutory mandatory overtime provisions are narrowly construed.  (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 794 (*Ramirez*); *Nordquist v. McGraw-Hill Broadcasting Co.* (1995) 32 Cal.App.4th 555, 562.)  The assertion of an exemption from the overtime laws is considered an affirmative defense, thus the employer bears the burden of proving the employee's exemption.  (*Ramirez, supra,* at pp. 794-795.)

Whether an employee is exempt "depends not only upon factors related to the job, itself (e.g., 'employer's realistic expectations' and 'realistic requirements of the job'), but also 'first and foremost' upon what an employee actually does on the job (e.g., 'work actually performed')."  (*Mies v. Sephora U.S.A., Inc.* (2015) 234 Cal.App.4th 967, 978.)  "'No bright-line rule can be established classifying everyone with a particular job title as per se exempt or nonexempt—the regulations identify job duties, not job titles.'"  (Ibid.

23

quoting *United Parcel Service Wage & Hour Cases* (2010) 190 Cal.App.4th 1001, 1015 [relying on Ramirez, supra, at p. 802 and 29 C.F.R. § 541.2 (2010)].)

## II.  *Standard of Review*

Task classification in an exemption case is a mixed question of law and fact. (*Ramirez, supra,* 20 Cal.4th at p. 794; *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 330.)  "We review the trial court's factual findings for substantial evidence and independently determine issues of law pursuant to a de novo standard of review."  (*Walker v. Physical Therapy Bd. of California* (2017) 16 Cal.App.5th 1219, 1227.)  Substantial evidence is evidence of ponderable legal significance that is reasonable, credible, and of solid value.  (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)

Relevant here, an employee's job duties and responsibilities, the employer's reasonable expectations, and the time an employee spent performing tasks are factual issues.  (*Ramirez, supra,* 20 Cal.4th at pp. 802-803 & fn. 5 [whether work activity is sales-related is mixed question of fact and law].)  Whether those facts establish the employee meets the legal elements and requirements of the exemption is a question of law, particularly to the extent it requires an interpretation of the applicable wage order or the incorporated federal regulations.  (*Ibid*; *Muldrow v. Surrex Solutions Corp.* (2012) 208 Cal.App.4th 1381, 1386 [whether commissioned employee exemption applied was primarily question of law and reviewed de novo]; *McInteer v. Ashley Distrib. Servs., Ltd.* (2014) 40 F.Supp.3d 1269, 1290-1291 [noting that, pursuant to *Ramirez, supra,* 20 Cal.4th at p. 794, "[t]he issue of what Plaintiff did as an employee for Defendants is a question of fact, while the precise scope of the exemption is a question of law"]; see generally *United Parcel Service Wage & Hour Cases, supra,* 190 Cal.App.4th at pp. 1024-1028 [whether undisputed, material facts about job duties established employee met the legal requirements of exemption determined as a matter of law].)

Ruan argues the omission of the statement of decision renders the record inadequate for meaningful review of the trial court's decision. A statement of decision facilitates appellate review by revealing the bases for the trial court's decision. (*Slavin v. Borinstein* (1994) 25 Cal.App.4th 713, 718.) Absent a statement of decision, the reviewing court presumes the trial court made all factual findings necessary to support the judgment and reviews those implied findings under the substantial evidence rule. (*County of Orange v. Barratt American, Inc.* (2007) 150 Cal.App.4th 420, 437-438.) This is the doctrine of implied findings, and it "'is a natural and logical corollary to three fundamental principles of appellate review: (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error.'" (*Id.* at p. 439.)[4]

This is a wage-and-hour misclassification case relating to the application of an exemption to Ruan's obligation to pay overtime and provide meal breaks, among other requirements. Task classification as exempt or nonexempt is a fact-intensive analysis which, as noted, presents a mixed question of law and fact. We will presume the trial court resolved any and all factual disputes in Ruan's favor (so long as supported by substantial evidence) and impliedly made all factual findings necessary to support the judgment. Whether Richardson's job falls within the *legal* criteria of the exemption requirements poses a legal question, which we consider de novo. For example, Richardson argues that, within the meaning of Wage Order 9 and the federal regulations incorporated therein, his dispatching duties were not "related to" the management

---

[4]    Here, the doctrine of implied findings applies due to the absence of a statement of decision within the record – it is as though no statement of decision was requested under Code of Civil Procedure section 632. (*In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 647.) Thus, we need not reach Ruan's additional argument the doctrine of implied findings applies because Richardson did not object to any ambiguity or omission in the statement of decision pursuant to Code of Civil Procedure section 634.

policies or general business operations of Ruan, nor did they involve the exercise of discretion and independent judgment. After presuming all findings of fact necessary to support the judgment in Ruan's favor were made by the trial court, we will consider de novo the question whether those tasks and duties meet the legal requirements of the exemption. (*County of Orange v. Barratt American, Inc., supra,* 150 Cal.App.4th at pp. 437-438; *Ramirez, supra,* 20 Cal.4th at pp. 794, 803 & fn. 5.)

## III. *Applicability of the Administrative Exemption*

### A. **Dispatcher Tasks Are Not Per Se Nonexempt Activities**

Threaded throughout Richardson's arguments is an assertion that dispatchers working for Ruan are primarily engaged in nonexempt work. Richardson claims 90 percent of his time as a transportation supervisor was spent on dispatcher duties, thus 90 percent of his duties and responsibilities were nonexempt. Richardson argues the trial court necessarily applied the incorrect legal standard in assessing his duties and responsibilities by transforming his nonexempt dispatcher duties into exempt duties merely because he performed them as a transportation supervisor.[5]

This argument rests on a false predicate: there is no legal authority identified by Richardson that recognizes the core functions of dispatchers to be categorically nonexempt activities. The fact that Ruan decided to treat dispatchers as nonexempt employees is not binding on our analysis here, nor does Richardson offer a prior legal decision that would, on the basis of res judicata, estop a determination that dispatcher duties as Richardson performed them in Ruan's Tulare terminal are exempt duties and tasks within the meaning of Wage Order 9 and the incorporated federal regulations.

---

[5] Richardson has forfeited his argument the trial court's statement of decision cited older federal authority and that it necessarily applied the wrong legal standard to evaluating his job duties. We have no statement of decision in the record to determine the correctness of the trial court's legal analysis. Whether Richardson's job duties come within the legal requirements of the exemption is considered de novo. (*Ramirez, supra,* 20 Cal.4th at pp. 794, 803 & fn. 5.)

Richardson's reliance on *Heyen v. Safeway, Inc.* (2013) 216 Cal.App.4th 795 (*Heyen*) in this respect ignores the distinction between the executive exemption and the administrative exemption. *Heyen* involved the executive exemption under Wage Order 7-2001, codified in California Code of Regulations, title 8, section 11070, related to mercantile employees. (*Heyen, supra,* at p. 817.) The executive exemption encompasses employees whose duties involve, among other things, the management of the employer's enterprise, regularly directing the work of two or more employees, and the authority to hire or fire or whose related recommendations will be given particular weight. (Cal. Code Regs., tit. 8, § 11070, subd. (1)(A)(1).) A relevant federal regulation observes, "[i]n the usual situation the determination of whether a particular kind of work is exempt or nonexempt in nature is not difficult. In the vast majority of cases the bona fide executive employee performs managerial and supervisory functions which are easily recognized as within the scope of the exemption." (29 C.F.R. § 541.102(a) (2000).)

Heyen was a supermarket assistant manager who, to meet the expectations of her employer, was required to perform many nonexempt tasks — i.e., tasks performed by courtesy clerks, stockers, and bookkeepers. (*Heyen, supra,* 216 Cal.App.4th at pp. 817-818.) There was no dispute about what types of tasks were exempt or nonexempt. (*Ibid.*)

On appeal, in the context of an assertion the jury was erroneously instructed, the dispute centered on whether exempt and nonexempt tasks performed concurrently should be deemed exempt because they were undertaken by a manager while functioning in her managerial capacity. (*Heyen, supra,* 216 Cal.App.4th at p. 819.) In interpreting the wage order and the incorporated federal regulations, the court held whether nonexempt tasks performed by a manager could be deemed exempt turned on the objective purpose for which they were undertaken, combined with consideration of the realistic expectations of the employer. (*Heyen, supra,* at pp. 827-829.) If the manager's actions, consistent with the reasonable expectations of the employer, were taken to supervise the employees or

27

contribute to the smooth functioning of the department, they were exempt work; if they were taken for some other reason, they were nonexempt work. (*Id.* at p. 827.)

Here, unlike in *Heyen*, there is a dispute whether the dispatching activities Richardson performed were exempt tasks or nonexempt tasks within the meaning of Wage Order 9, and the distinction between the two is not simple. Ruan does not argue Richardson's dispatching tasks were exempt merely because he undertook them as a supervisor. Ruan's argument is that the dispatching tasks themselves, and also particularly as Richardson performed them within his role as transportation supervisor, were exempt activities. Whether Ruan employees with the title "dispatcher" at the Tulare terminal may have been paid hourly or deemed nonexempt employees by Ruan is irrelevant – we must look at the tasks performed to determine the applicability of the exemption, not the title held or how Ruan decided to classify them. "No bright-line rule can be established classifying everyone with a particular job title as per se exempt or nonexempt." (*United Parcel Service Wage & Hour Cases, supra,* 190 Cal.App.4th at p. 1015.) Dispatchers are not, the world over, performing the same duties. It is not even clear dispatchers and transportation supervisors at Ruan performed the same dispatching duties across the company, particularly when the freight type differed.

**B.      Whether Richardson's Job Tasks Meet the Exemption Requirements**

As relevant here, the administrative exemption applies to an employee (1) whose job duties and responsibilities involve the performance of office or nonmanual work directly related to management policies or general business operations of the employer or the employer's customers; (2) who customarily and regularly exercises discretion and independent judgment; (3) who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; (4) who is primarily engaged in duties that meet the exemption; and (5) who earns a monthly salary equivalent to no less than two times the state minimum wage for full-time employment. (Cal. Code Regs., tit. 8, § 11090, subd. (1)(A)(2)(a)-(g).)

28

There is no dispute about the interpretation of the requirements to satisfy elements 3 and 5, nor is it disputed substantial evidence supports a finding Ruan met those elements. The parties dispute the legal scope of elements 1 and 2 and whether the tasks Richardson performed come within the terms of these requirements. Whether there is substantial evidence that Richardson was primarily engaged in tasks that meet the exemption is dependent upon whether his job tasks come within the scope of elements 1 and 2.[6]

### 1. *"Directly Related To" Element*

The parties' dispute centers on whether Richardson's job duties and tasks as a transportation supervisor were "directly related" to Ruan's "management policies" or "general business operations" or the general business operations of Ruan's customers. (Cal. Code Regs., tit. 8, § 11090, subd. (1)(A)(2)(a)(i).)

For purposes of the administrative exemption, the California Supreme Court has clarified that to be "directly related" to management policies or general business operations, the work performed by an employee must be both "qualitatively administrative" and "quantitatively … of substantial importance to the management or operations of the business." (*Harris, supra,* 53 Cal.4th at p. 181.)

Pursuant to Wage Order 9, 8 California Code of Regulations section 11090 directs that "activities constituting exempt work and non-exempt work shall be construed in the

---

[6] Again, in absence of a statement of decision, all factual findings underpinned by substantial evidence that support application of the exemption requirements are presumed to have been made by the trial court. To the extent there were any disputes in the testimony about Richardson's job tasks, the scope of his supervisorial role and authority, or the breadth of his exercise of discretion, they are presumed to have been resolved in a manner that supports application of the exemption. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 61-62 [because judgment is presumed correct, and because appellant bore the burden of affirmatively proving error, doctrine of implied findings requires inference trial court made every implied factual finding supported by substantial evidence necessary to affirm the judgment].)

same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.201-205, 541.207-208, 541.210, and 541.215." (Cal. Code Regs., tit. 8, § 11090, subd. (1)(A)(2)(f).)

Code Federal Regulations, title 29, former part 541.205 (2000) (former part 541.205)[7] provides as follows:

> "(a) The phrase 'directly related to management policies or general business operations of his employer or his employer's customers' describes those types of activities relating to the administrative operations of a business as distinguished from 'production' or, in a retail service establishment, 'sales' work. In addition to describing the types of activities, the phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers.
>
> "(b) The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for, example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control….
>
> "(c) As used to describe work of substantial importance to the management or operation of the business, the phrase 'directly related to management policies or general business operations' is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole. Employees whose work is 'directly related' to management policies or to general business operations include those [whose] work affects policy or whose responsibility it is to execute or carry it out….

---

[7] All references to the Code of Federal Regulations are to the version that came into effect in July 2000, not subsequently amended versions of those regulations, unless otherwise noted. (See *Harris, supra,* 53 Cal.4th at pp. 179-180.)

"(1) It is not possible to lay down specific rules that will indicate the precise point at which work becomes of substantial importance to the management or operation of a business. It should be clear that the cashier of a bank performs work at a responsible level and may therefore be said to be performing work directly related to management policies or general business operations. On the other hand, the bank teller does not. Likewise it is clear that bookkeepers, secretaries, and clerks of various kinds hold the run-of-the-[mill] positions in any ordinary business and are not performing work directly related to management policies or general business operations. On the other hand, a tax consultant employed either by an individual company or by a firm of consultants is ordinarily doing work of substantial importance to the management or operation of a business." (29 C.F.R. § 541.205(a)-(c).)

The qualitative requirement articulated in *Harris* stems from former parts 541.205(a) and 541.205(b). (*Harris, supra,* 53 Cal.4th at pp. 180-182.) Former part 541.205(a) articulates that work "'directly related to the management policies or general business operations'" describes activities "relating to the administrative operations of a business"; and part (b) provides, in turn, that the "administrative operations of the business" include work performed by "so-called white-collar employees engaged in 'servicing' a business [such as] advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." The *Harris* court explained that former part 541.205(c) relates to the quantitative component "that tests whether work is of 'substantial importance' to management policy or general business operations." (*Harris, supra,* 53 Cal.4th at p. 182.) Both the qualitative and the quantitative components must be satisfied for work to be considered "directly related" to the management policies or general business operations. (*Id.* at pp. 181-182.)

### a. Qualitatively Administrative Prong

Richardson argues there is no evidence the work tasks he performed more than 50 percent of his day were *qualitatively* administrative. The fact that he monitored the

31

boards and made individualized changes does not translate into servicing the business – he did not perform any of the activities articulated in former part 541.205(b). He did not make decisions for the business or that related to the business as a whole. Richardson also notes he performed none of the "functional areas" identified in part 541.201, such as budgeting, human resources, entering into contracts, marketing, making termination decisions, and similar activities.[8]

Ruan argues the dispatch tasks Richardson testified he was engaged in 90 percent of the time were qualitatively administrative: Richardson's main responsibility was to maximize Ruan's profits by ensuring that its dairy pickup business operated efficiently and cost-effectively. The vast majority of his duties were related to managing and dispatching dozens of drivers to ensure that Ruan's business was profitable. Ruan also notes that former part 541.208(e) illustrates how a supervisor who handles a company's transportation problems, in ways very similar to Richardson, meets the administrative exemption. Moreover, Richardson not only had the authority to make decisions that impacted Ruan, but his duties had a significant financial impact on the business.

As set forth in former part 541.205(b), the administrative operations of a business include the work performed by employees involved in "'servicing'" the business, and it provides examples including advising the management, planning, negotiating, representing the business, purchasing, promoting sales, and performing business research and control.

Richardson argues he performed none of these activities, and the absence of such activities is critical to the application of the exemption. He notes that in *Combs v. Skyriver Communications, Inc.* (2008) 159 Cal.App.4th 1242, 1265, an employee was held to fall within the administrative exemption because his work involved tasks

---

[8] To the extent Richardson argues he did not perform the "functional areas" identified by part 541.201(c), his brief cites to a later version of part 541.201, not the 2000 version of former part 541.201 incorporated by Wage Order 9.

enumerated by the regulation such as budgeting, purchasing, and procurement. While these are types of activities that involve "servicing" a business, as recognized in *Combs, supra,* at page 1265, they are not the only types of activities that could conceivably be considered "servicing" the business – the activities outlined in the regulation are not an exhaustive or exclusive list.

Former part 541.208 provides various illustrations of the types of work that is considered administratively exempt. One of the illustrations describes a "traffic manager [who] is employed to handle the company's transportation problems. The exempt work performed by such an employee would include planning the most economical and quickest routes for shipping merchandise to and from the plant, contracting for common-carrier and other transportation facilities, negotiating with carriers for adjustments for damages to merchandise in transit and making the necessary rearrangements resulting from delays, damages, or irregularities in transit." (29 C.F.R. § 541.208(e).)

Richardson's dispatching tasks and duties mirror, in many respects, this illustration. Richardson did not plan the initial designation of routes, but throughout the shift he would rearrange the routes to meet myriad variables that arose during the shift. This took a significant degree of planning to synthesize the needs of the customer – both the dairies and CDI – while maintaining operational efficiency for profit and observing driver limitations such as wash tags and times of service. Schott testified Richardson had to account for those variables when planning changes to the routes to meet varying situations. Balaam testified Richardson was the highest ranking supervisor on the night shift, and he was charged with running the operations of the terminal during that time.

Richardson's job activities involved more than meeting individualized, day-to-day operational tasks of transporting milk. Because of the array of variables involved in timely pickups and delivery of milk, there was no single course of internal operations to meet ever-changing customer needs, account for all the regulatory aspects of collecting and transporting the milk (wash tags, hours-of-service limitations, dairy tank

33

sanitization), and manage safe and efficient equipment utilization all while balancing Ruan's profit margin requirements. RedTrak could provide fast access and tracked some of the variables that had to be assessed in formulating the most efficient delivery and pickup plans, but as Schott testified, it could not analyze the data.

For Ruan's milk transport to operate profitably, it had to do more than simply pick up milk on time from dairies and deliver the correct number of loads to the correct plant or creamery. There had to be real-time assessment of operational efficiency under whatever combination of variables was presented at any given moment – such assessment, analyzing, and planning could not be done ahead of time. While there was a template for the basic pickup and delivery structure formulated ahead of each shift, that template only remained effective both for customer service *and* for Ruan's internal operational needs so long as nothing changed – e.g., no driver was absent, no customer required different load counts, no plant delivery change was needed, no dairy required a different pickup time, no plant had wait times or changes in product. If Richardson had only been responsible for getting milk picked up on time and then delivering it to the creameries in the correct amounts, he would be servicing customer needs, not servicing internal administrative operations of Ruan. However, Richardson had to assess, plan, reorganize *how* Ruan could both meet its customers' needs while maintaining Ruan's internal operational need for efficiency in the use of personnel and equipment. Substantial evidence established that was far more involved than "monitor[ing] the boards," as Richardson argues were all that his work tasks entailed.

Richardson oversaw approximately 40 drivers on his shift. He was authorized and expected to monitor driver attendance, call drivers in to work, send drivers home if necessary, resolve their complaints, ensure meal breaks were provided to them, and issue correction reports for various infractions by drivers. While the act of issuing a correction to a driver was not a task he undertook frequently and thus this particular activity did not take a significant amount of his time on a daily basis, Richardson was responsible for

34

overseeing whether drivers were meeting their obligations, which, inferable from the testimony of Balaam, Schott and Richardson himself, was an ongoing oversight task.

Schott testified Richardson's role interacting with CDI was critical to ensuring the terminal maintained its most important customer. Richardson's role with CDI involved far more than simply taking orders about load volume from CDI. In response to load requests or other changes from CDI, Richardson had to reassess, replan, or create new routes; call in drivers; and marshal equipment. In doing this, he had the authority to represent Ruan, and his decisions with regard to how to manage CDI's needs impacted both Ruan's farm transport operations at that terminal and its financial bottom line.

In his nightly duties and responsibilities, Richardson marshaled equipment; had an ongoing obligation to oversee drivers, offer coaching, and complete correction reports when necessary; he planned and replanned routes based on Ruan's economic profitability; during his shift, he solely represented the company with its most valuable customer at that terminal; determined whether and how the needs of that customer could be met; and all of this was performed almost entirely without any direct oversight or prior approval.

Richardson argues these tasks were not tantamount to running the business as a whole. But, there is no requirement "servicing" a business must involve the needs of the entire company. (See 29 C.F.R. § 541.205(b).) Richardson was servicing Ruan's milk transport business by analyzing all the variables involved in timely pickup, transport and delivery of the milk, and then deploying and managing Ruan's resources – personnel and equipment – to meet Ruan's thin profit margin. That was a vital component of Ruan's internal administrative operations at the Tulare terminal – ongoing, real-time analysis of the profitability of the pickup and delivery system to manage the deployment of Ruan's resources in a manner that best satisfied Ruan's bottom-line profit margin considerations. In short, Richardson's tasks were qualitatively administrative.

35

### b. Quantitatively Administrative Prong

In former part 541.205(a), the phrase "directly related to management policies or general business operations" is limited "to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers." (29 C.F.R. § 541.205(a).) In former part 541.205(c), work of substantial importance "is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole." (29 C.F.R. § 541.205(c).) Former part 541.205(c)(1) recognizes it is "not possible to lay down specific rules that will indicate the precise point at which work becomes of substantial importance to the management or operation of a business." (29 C.F.R. § 541(c)(1).) As guideposts on a continuum, the regulation went on to draw the distinction between the cashier of the bank who performs work directly related to the management policies or general business operations and the bank teller who does not. (*Ibid.*)

Richardson argues his work was not quantitatively administrative: it did not affect company policy or carry out or execute company policy. Rather, his work was performed under the supervision of a higher-level manager. His work, he argues, was like that of a bank teller who is not performing tasks of substantial importance to the company. Although his work was important to Ruan, he argues he had no more responsibility and discretion in carrying it out than a bank teller does in greeting a customer, taking money, performing addition or subtraction, and addressing the customer's needs.

As pointed out in *Rieve v. Coventry Health Care, Inc.* (2012) 870 F.Supp.2d 856, whether an employee performs work of substantial importance is "a delicate analysis" because all employees of a business "must serve *some* essential function, or their respective positions would not exist." (*Id.* at pp. 872-873.) The court analogized that, while a retail clothing store cannot function without a store manager, it is also unable to function without sales people. (*Ibid.*) The court reasoned that "[t]he key inquiry is thus perhaps not one of relativity or a focus on the word 'substantial' but rather an

36

examination of whether the employee's value directly flows 'to the management or operation of the business.'" (*Id.* at p. 873.) *Rieve* reasoned this language implied that the employee in question would be expected to hold a supervisory position instead of serving on the front lines of the business – "it would seem that an employee whose value flows to management or the operation of the business would actually supervise other employees." (*Ibid.*)

Richardson was the highest ranking supervisor on the night shift, and he worked with very little oversight. As already noted, Richardson's work duties and responsibilities required him to perform real-time assessment of existing variables to deploy resources in a manner that met Ruan's thin profit margin needs. That assessment could not be done ahead of time in the absence of the real-time variables, it could only be plotted generally. To implement his efficiency analysis in any given scenario, Richardson had direct and ongoing oversight of approximately 40 drivers during his shift, and he was the sole contact on his shift for the terminal's most important customer.

Beyond his supervisorial role, if Richardson failed to analyze the data and variables correctly, his assessment would have a direct impact on millions of dollars of product being moved each week on a very thin profit margin. Former part 541.205(c)(2) is clear that simply because serious consequences or losses to the employer may flow from an employee's neglect, this does not transform otherwise clerical work into that of substantial importance to the manager or operation of the business. (29 C.F.R. § 541.205(c)(2).) For example, "[a] messenger boy who is entrusted with carrying large sums of money or securities cannot be said to be doing work of importance to the business even though serious consequences may flow from his neglect." (*Ibid.*)

Richardson's work was of substantial importance to the operations of Ruan's business not because his mistakes would have been financially significant to the company, but because the company's ability to carry out milk transport in a financially feasible way was dependent on how Richardson assessed real-time conditions to make

37

ongoing profitability and efficiency analyses while managing and making decisions about Ruan's operational resources. RedTrak could not perform those operational efficiency analyses, nor could they be assessed by anyone else in advance or plotted out ahead of time on some sort of formulaic decision tree. Given its thin profit margin, Ruan could not have maintained its milk transport business at the Tulare terminal without the real-time efficiency analyses performed by Richardson as a transportation supervisor. If Richardson were merely directing drivers based on efficiency analyses performed by RedTrak or pursuant to a preset protocol, he would be more like a bank teller who does not perform work of substantial importance. (29 C.F.R. § 541.205(c)(1).) However, Richardson himself was assessing and analyzing the data to make determinations about what actions, or series of actions, would meet customer needs, satisfy relevant regulatory parameters, and be most profitably efficient to Ruan; then, based on those analyses, he had to decide what resources to deploy and how. Those assessments and determinations are more akin to those made by the cashier of the bank than the bank teller.

We conclude Richardson's tasks dispatching drivers, analyzing variables to meet profit considerations, and overseeing and managing the safe, proper, and effective utilization and deployment of Ruan's resources was quantitatively administrative work of substantial importance to the management or operations of the business.

### 2. Exercises Discretion and Independent Judgment Element

The parties also dispute whether Richardson's tasks as transportation supervisor met the second element of the administrative exemption, which requires that an exempt employee "customarily and regularly exercises discretion and independent judgment." (Cal. Code Regs., tit. 8, § 11090, subd. (1)(A)(2)(b).) While Wage Order 9 and the regulation codified thereunder do not define "discretion and independent judgment," former part 541.207, which Wage Order 9 incorporates, states that the exercise of discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities

38

have been considered. The term … implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." (29 C.F.R. § 541.207(a).) "Matters of significance" means the decision to be made is relevant to something consequential and not trivial. (*Id.* at § 541.207(d).) Matters of significance applies to the kinds of decisions made by those who "exercise authority within a wide range to commit their employer in substantial respects financially or otherwise." (*Id.* at § 541.207(d)(2).)

The regulations also indicate there has been frequent confusion "between the exercise of discretion and independent judgment, and the use of skill in applying techniques, procedures, or specific standards." (29 C.F.R. § 541.207(b).) As an example of the distinction, the regulation poses this scenario: "An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories … is not exercising discretion and independent judgment." (*Id.* at § 541.207(c)(1).)

Richardson argues his work duties did not involve discretion and judgment, only the use of skill he acquired through on-the-job experience. He maintains the evidence shows only that he monitored boards and rerouted trucks based on the skill he developed with the RedTrak system. He honed his skills on the job, which were then implemented through manipulation of the RedTrak software system that he did not create, nor could he change. We disagree.

The nature of dispatching duties under the particular conditions navigated by Richardson involved a significant exercise of discretion and independent judgment on matters of significance. Richardson was required to make ongoing efficiency assessments in meeting customer needs while accounting for Ruan's operational efficiencies that were critical to profits at that terminal. These assessments were not made within a preset framework of standards or a decision model that Richardson simply

39

implemented. Richardson's work was not like that of inspectors who "may have some leeway in the performance of their work but only within closely prescribed limits." (29 C.F.R. § 541.207(c)(2).) Richardson did not simply dispatch drivers to meet specific time frames and loads for the customer, he had to assess how that could be done with an evolving number of distinct variables, choosing from among different alternatives to accomplish all the necessary objectives, which he had to assess for importance and financial efficiency. If RedTrak had assessed the data and informed Richardson there were only two most efficient configurations of the variables that met all the objectives, and he could select from among those two, this would not be an exercise of discretion and judgment – dispatching drivers would involve only his skill and training in implementing RedTrak instructions and selecting among predetermined choices. But that was not the situation.

The comparison shopping example in former part 541.207(c)(6) also provides guidance. The regulation distinguished comparison shopping performed by an employee of a retail store with that of a buyer. While the comparison shopper who "merely reports to the buyer his findings as to the prices at which a competitor's store is offering merchandise of the same or comparable quality" is not exercising discretion and independent judgment, the buyer who evaluates the assistants' reports and then directs that certain items be repriced is exercising discretion and judgment. (29 C.F.R. § 541.207(c)(6).) Richardson's work is more like the buyer who evaluates the variables and makes an election about what will serve the needs of the business best, and then directs resources to accomplish that end without any direct supervision.

Moreover, Richardson exercised authority "within a wide range to commit [his] employer in substantial respects financially or otherwise." (29 C.F.R. § 541.207(d)(2).) Richardson had autonomous oversight of meeting CDI's needs during the night shift in almost all respects, and he could create special routes to Los Angeles without prior approval. He could determine in his discretion whether there were sufficient employees

40

to meet customer needs, whom to call in, whom to send home, and how to rearrange resources and schedules to meet the need for efficiency and maximizing profitability.

Richardson's work duties and responsibilities clearly fit the federal regulatory guidance of what constitutes the exercise of discretion and independent judgment.

### 3. Primarily Engaged in Duties Which Meet the Test of the Exemption Element

Up to 90 percent of Richardson's work duties and responsibilities involved his tasks dispatching drivers, representing Ruan with CDI, assessing and replanning routes in light of constantly changing variables in a manner that was most operationally efficient for Ruan, and managed and oversaw drivers on his shift. As discussed above, this work was office work directly related to management policies or general business operations— both qualitatively and quantitatively administrative—and which customarily and regularly required Richardson to exercise discretion and independent judgment.[9] As such, there is substantial evidence Richardson was "primarily engaged" in duties that meet the test of the exemption, as defined by Wage Order 9-2001 (Wage Order 9, subd. 2(K) ["'Primarily' as used in Section 1 … means more than one-half the employee's work time."].)

### 4. Conclusion

Construing the exemption requirements narrowly (*Ramirez, supra,* 20 Cal.4th at pp. 794-795), the trial court correctly determined Ruan met its burden to establish Richardson's duties and tasks as transportation supervisor fit within the administrative

---

[9] There is no dispute Richardson performed under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge (Cal. Code Regs., tit. 8, § 11090 (1)(A)(2)(d)), or that Richardson earned a monthly salary equivalent to no less than two times the state minimum wage (*Id.* at § 11090 (1)(A)(2)(g)). Moreover, there is substantial evidence underpinning these findings, which impliedly were made in support of the judgment in favor of Ruan.

exemption of Wage Order 9, codified at California Code of Regulations section 11090, subdivision (1)(A).

## IV. *Remaining Arguments*

Richardson argues he was not an exempt employee under the executive exemption. As the trial court's judgment that Richardson is an exempt employee is affirmed, we need not reach whether another exemption applies. It is also not clear Ruan ever asserted the executive exemption as an affirmative defense.

## DISPOSITION

The judgment is affirmed. Respondent is awarded the costs of appeal. (Cal. Rules of Court, rule 8.278, subd. (a)(1).)


                                                                        SMITH, J.

WE CONCUR:


DETJEN, Acting P.J.


MEEHAN, J.